ROBERTS *v.* INTERSTATE LIFE & ACCIDENT INSURANCE COMPANY

No. 40576          November 18, 1957          98 So. 2d 632

*H. C. (Mike) Watkins*, Meridian, for appellant.

*Snow & Covington*, Meridian, for appellee.

ETHRIDGE, J.

At the time of insured's death, the $1,100 life insurance policy written by appellee Interstate Life and Accident Insurance Company insured him against the sustaining of "bodily injuries effected solely through violent, external, and accidental means, and . . . such bodily injuries (as) have directly and independently of all other causes, caused the death of the Insured".

A later part of the policy contained a section designated "Exceptions", which provided in part: "No indemnity for Death by Accidental Means shall be payable if death results . . . (c) from injuries intentionally inflicted upon the Insured by himself, while sane or insane, or by any other person other than burglars or robbers, (d) from participation in an assault or felony, . . ."

Albert Roberts, the insured, was killed by Mack Thomas. In a suit on the policy, brought by the widow, appellant Lillie B. Roberts, in the County Court of Lauderdale County, the jury returned a verdict for plaintiff and judgment was entered thereon. Defendant insurance company appealed to the Circuit Court. It reversed the county court and rendered judgment for defendant, on the ground that the evidence showed that Thomas was not a burglar or robber, but he killed Roberts as the result of an argument over a debt Roberts owed him. Therefore, it was said, insured was intentionally killed by a person other than a burglar or robber, and such death is excepted from coverage of the policy.

The question is whether there was substantial evidence to support the finding of the jury in the county court that Roberts was killed by a burglar or robber, or, stated

differently, whether the testimony created an issue of fact for the jury to decide.

■■ The declaration alleged that the contract of insurance insured the risk of death inflicted upon insured by a person while committing the crimes of burglary or robbery. The beneficiary, plaintiff, had the burden of proving this allegation. 21 Appleman, Insurance Law and Practice (1947), Sec. 12181.

■■ With reference to the circuit court's action directing judgment for defendant insurance company, the evidence and all reasonable inferences from it must be construed most favorably to plaintiff. This rule is particularly applicable here, since the county court jury returned a verdict for plaintiff. ■■ And if there is any reasonable evidences upon which the jury's verdict could have been based, it should be upheld.

Albert Roberts, a negro man about 32 years of age, worked for Mr. Press Tinnin, a farmer and merchant, and lived on his place about 8 miles out of the City of Meridian. He earned a salary of $30 per week. On Saturday morning, December 4, 1954, Tinnin paid Roberts that amount, less $7 owed Tinnin on Roberts' charge account at the store. Roberts and his wife Lillie were not living together at that time. On the morning of December 4 he went to the place where his wife was staying, and they agreed to resume cohabitation. He gave her $2 which he took from a wallet he was carrying. She testified that Albert paid no rent on the house in which he was living, raised most of his food, and about the only expense he had was for insurance premiums. Plaintiff observed when he gave her the $2 that he had a sizable amount of money in his wallet.

About six weeks before the killing on December 5, Mack Thomas asked Tinnin for regular work, and was informed that a neighbor would probably hire him, and he could do extra jobs for Tinnin. Thomas then moved in the house where Roberts was living on Tinnin's place,

and the two men lived there together up until about a week before Roberts was killed, at which time Thomas moved to a house on a nearby farm where he was working. On Sunday morning, December 5, Roberts bought gasoline at Tinnin's store and charged the purchase. Tinnin stated that this was customary. He then asked Roberts to tell Thomas to come and do some work for him on Monday. That Sunday afternoon Thomas, Roberts, Bell and a girl rode around together in Roberts' car. He bought some beer for them, and at about sunset Roberts drove the girl and Bell home. Bell said that was the last time he saw Roberts and Thomas that day. He did not observe any animosity or ill-feeling between them while he was with them.

That Sunday night, December 5, Mack Thomas came to Tinnin's house before midnight and waked him up. Tinnin said Thomas wanted him to see about Roberts, whom Thomas said he had hit in an argument about some money Roberts owed him. Tinnin went to Roberts' house and found him stretched out on a bench dead, with his head split open by an axe. Thomas told him the axe was leaning against the pump house. Tinnin went to the back door and found a piece of galvanized pipe leaning against the wall. Roberts had been sitting on a small bench next to a table, repairing a radio. He did repair work on radios and watches. Tinnin said that the blow hit Roberts on the forehead and skull and he fell backwards. There was a gash on the wall where apparently the first blow from the axe had hit after missing Roberts. Roberts had in his hip pocket a toy pistol. Tinnin testified: " .. it looked like this Negro Mack Thomas took him up and raffled his pockets and later moved him. because his blood was puddled up at one place and his brains was laying out to one side away from the puddle of blood. .... I did not see him riffle the house and the dead man's pockets but I know that there was no money on him when the officers got there and that two of his

pockets were turned wrong side out." These statements were objected to but the court did not rule on them. Tinnin further said that the bedclothes were on the floor and the mattress turned up and in a roll. "Everything had been gone through and torn up or scattered around. You could tell somebody had been through the place searching it." Tinnin stated he knew of no trouble between Thomas and Roberts. Thomas did not testify.

Harry Hughes, deputy sheriff, went to Roberts' house that night and found him dead. He testified: "When we got there he was over there on that bench and his pockets had been turned out—his front pockets—and the back pocket had a pistol in it. It was a home made pistol, would not shoot; had never been fired—I believe that was in his lefthand hip pocket, and the front pockets had been turned out and robbed by this boy Mack Thomas. He did not have any money on him."

No objection was made to this testimony. Roberts did not have a wallet or any money on him. Hughes said that Thomas told him that he hit Roberts because they got in an argument over $50 Roberts owed him, and "that is what started it". He saw no bruises or lacerations on Thomas indicating that he had been hit anywhere or had been injured in any way. There was blood on the axe handle.

■■■ The injuries which caused Roberts' death were intentionally inflicted upon him by Mack Thomas. The question is whether the jury was warranted in finding that they were effected solely through violent, external and accidental means by a robber. We think the jury was amply justified in concluding, as it apparently did, that Thomas hit Roberts with the axe while Roberts was sitting at the bench and table repairing a radio; that the blow came from behind and was unexpected; that thereafter Thomas ransacked Roberts' pockets and removed from them his wallet and money, and also ransacked the covers and the mattress on his bed looking for valuables;

and that his motive in killing him was to rob him. The jury had the right to reject Thomas' story, as he related it to Tinnin and Hughes, to the effect that he and Roberts had an argument over a debt. ██ █ And it could consider that part of the testimony of Tinnin and Hughes which was hearsay but unobjected to, for whatever probative value it had. Citizens Bank of Hattiesburg v. Miller, 194 Miss. 557, 565-567, 11 So. 2d 457 (1943).

██ █ Where an insurance policy insures against death through violent, external and accidental means, and the policy does not exclude death intentionally inflicted by another if the killer is a robber, and the insured is killed by a robber, the death of the insured is accidental and compensable within the meaning of the policy. 1 Appleman, Insurance Law and Practice (1941), Sec. 488; 29 Am. Jur., Insurance, Sec. 971; see Occidental Life Ins. Co. of Cal. v. Barnes, 84 So. 2d 423 (Miss. 1956). The annotations in 36 A. L. R. 1124 (1925) and 46 A. L. R. 1083 (1927) discuss a number of cases construing provisions in insurance policies concerning injuries incident to robbery and burglary. ██ █ The decisions dealing with somewhat similar provisions have recognized that the jury may consider circumstantial evidence in determining whether the killing was incident to a robbery, and may draw inferences from the evidence to reach its own conclusion as to the reason for the killing. The jury here could reject Thomas' version and conclude that he killed Roberts for the purpose of robbing him. Certainly reasonable men might draw different inferences from the facts and testimony presented to the jury. Continental Casualty Co. v. Daniels, 173 So. 302 (Miss. 1937); Floyd v. Missouri State Life Ins. Co., 11 F. Supp. 1001 (D.C. Miss., 1935); Jefferson Standard Life Ins. Co. v. Jeffcoats, 164 Miss. 659, 143 So. 842 (1932).

Somewhat similar to the instant case is Aetna Life Ins. Co. v. Rustin, 151 Ky. 103, 151 S. W. 366 (1913), rehearing denied, 152 Ky. 42, 153 S. W. 14. See also Weid-

ner v. Standard Life and Accident Ins. Co. of Detroit, 130 Wis. 10, 110 N. W. 246 (1906), on second appeal in 132 Wis. 624, 113 N. W. 50 (1907); Order of United Commercial Travelers of America v. Williams, 11 Fed. 2d 577, 46 A. L. R. 1081 (CCA 6th, 1926); National Life and Accident Ins. Co. v. Hannon, 214 Ala. 663, 108 So. 575 (1926); see 1 Appleman, Insurance Law and Practice (1941) Secs. 488, 492; 21 ibid. (1947), Sec. 12181; 22 ibid., Sec. 13322.

For these reasons, the judgment of the circuit court is reversed and the judgment of the county court is reinstated and affirmed.

Reversed and judgment of county court for appellant reinstated and affirmed.

*McGehee, C. J.,* and *Lee, Holmes* and *Arrington, JJ.,* concur.