603 So.2d 330 (1992)
James E. WARWICK and Barbara Rhea Warwick
v.
Cecil B. MATHENEY.
No. 89-CA-0072.
Supreme Court of Mississippi.
June 10, 1992.
*332 Dana E. Kelly, Phelps Dunbar Firm, Jackson, for appellant.
Dale Hubbard, Ferrell & Hubbard, Jackson, and Mignon Mestayer DeLashmet, Mobile, Ala., for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
James E. Warwick and his wife Barbara Rhea Warwick appeal a jury verdict of $92,000 entered against them in a breach of contract action brought against them by Cecil B. Matheney in the circuit court of the First Judicial District of Hinds County. Matheney cross-appeals the lower court's refusal to award him prejudgment interest. Finding no reversible error, we affirm.

FACTS
In October, 1983, Cecil B. Matheney, a motor vehicle appraiser for a bank, purchased the Ford dealership in Raymond from George Cooper. No person can be a franchised dealer in Ford Motor Company (Ford) vehicles without its and Ford Motor Credit Corporation's (Ford Motor Credit) approval. Cooper also owned the building and approximately ten acres of land where the Raymond dealership was located, and in the sale of the franchise, Cooper and Matheney entered into a long-term lease of this property.
Matheney formed Matheney Ford, Inc., a close corporation with himself the sole owner of 4,000 authorized shares. This corporation owned and operated the Ford dealership business in Raymond.
Ford dealers pay Ford Motor Company for their cars when they are manufactured and ready for shipment. Conventionally, dealers finance their purchases of new cars through Ford Motor Credit, which pays Ford the dealer's cost of the unit. Until the dealer sells the unit, he owes Ford Motor Credit, and is obligated, upon its sale, to immediately notify and pay Ford Motor Credit its loan on the car.
Failure of a dealer to promptly pay Ford Motor Credit on sale of the car is called "float" in the trade, and is an unauthorized and disapproved use of Ford Motor Credit's funds.
Because Matheney Ford lacked sufficient working capital, its operations were financially unsuccessful.
On October 18, 1984, Gene Trahan, branch manager for Ford Motor Credit in central Mississippi, wrote Matheney Ford that it was suspending its new vehicle wholesale line. Matheney Ford was $300,000 over its authorized credit line, a check to Ford Motor Credit for sale of a new car had not cleared, the financial statements furnished Ford Motor Credit appeared inaccurate, and the dealership was losing money.
Matheney and Trahan had discussions of Matheney Ford's problems and the credit corporation did a field credit review of Matheney Ford's operations and its financial records. A December 31, 1984, financial statement on a Ford Motor Credit form showed a $54,678 loss for 1984. The dealership continued consistently losing money in 1985. Another financial statement on Ford Motor Credit's form dated April 30, 1985, showed a loss of $95,686.
On May 28, 1985, Trahan wrote Matheney listing certain conditions which had to be met before the credit corporation would reopen its financing, or "floor planning" of Matheney Ford's vehicles. One requirement was an additional $100,000 cash investment in the business.
James E. Warwick and his wife Barbara Rhea Warwick were interested in becoming *333 a Ford dealer. In some manner they met Matheney in May, 1985, and in short order their mutual desires were communicated. At the time the only experience the Warwicks had in the automobile business was selling used cars wholesale. Matheney told them that because they had no experience as a franchised automobile dealer, it would be easier to get the franchise transferred to them ultimately if they first presented Ford Motor Company and Ford Motor Credit with a contract showing the Warwicks as investors.
The Warwicks' lawyer prepared all contracts between the Warwicks and Matheney and Matheney Ford.
On June 4, 1985, three written contracts were executed between the Warwicks and Matheney Ford and Matheney, individually.
The first contract, entitled "Agreement for Issuance and Purchase of Corporate Shares," obligated Matheney Ford to amend its articles to authorize the issuance of 3,843 additional shares, and for the Warwicks to purchase these shares for $200,000 cash. Upon this payment the Warwicks would own 49% of the corporate shares of the corporation.
This contract made the Warwicks' investment contingent upon the express approval by Ford and Ford Motor Credit.
The second contract gave the Warwicks a thirty-day option from closing to purchase two percent (2%) of the additional authorized shares from Matheney for $100. This was to enable the Warwicks, upon approval by Ford and the credit corporation of their investment contract, to purchase and own a total of 51% of the outstanding shares of Matheney Ford.
The third contract required the Warwicks and Matheney to mutually hire a manager to operate and manage the business. The manager would immediately purchase one-half of Matheney's remaining 49% ownership shares in Matheney Ford, and the manager would also be given an option to purchase Matheney's remaining half of the corporate shares.
While the second and third contracts are essential to the understanding between the parties, litigation arose only from the first contract. This contract is a ten-page document. It required the Warwicks to deposit $5,000 in escrow to assure compliance. It concludes with the following provisions:
Furthermore, if Ford Motor Company or Matheney Ford shall, for any reason, fail or refuse to grant approval, as contemplated by this Agreement, then the Escrow Agent shall promptly refund the entire sum to the Warwicks.
Paragraph 4 of the contract reads:
4. Approval of Ford Motor Company and Ford Motor Credit Company. This sale is contingent upon approval by Ford Motor Company and Ford Motor Credit Company. It is understood that the Ford dealership transferred hereby cannot be owned and/or operated by any party or parties except upon the approval of Ford Motor Company and the execution by Ford Motor Company and such other party of all necessary and appropriate documents, whereby said party becomes a Ford dealer. In the event that Ford Motor Company refuses to approve the Warwicks as investors in this dealership, or for any other reasons refuses to execute any and all necessary documents, then all obligations of the Warwicks hereunder shall cease and the Warwicks shall be entitled to a refund of any and all amounts paid pursuant to this Agreement. Furthermore, Ford Motor Credit Company must grant approval for credit and floor planning purposes. In the event that Ford Motor Credit Company so refuses, there shall be no further obligation on the part of the Warwicks and any and all amounts paid pursuant to this Agreement shall be immediately refunded.
No time limit in which Ford and Ford Motor Credit were to approve was set out in the contract.
Attached to the contract as Exhibit A are the financial statements of December 31, 1984, and April 30, 1985, above referred to. Exhibit B to the contract is a listing of the furniture, fixtures, parts, and motor vehicle inventory and a memorandum agreement between Cooper and Matheney dated July *334 8, 1983, and Exhibit C is a copy of the lease agreement between Cooper and Matheney dated October 10, 1983.
Under the contract Matheney Ford and Matheney warranted that the corporation was in good standing, and that they knew of no reason to believe there were any other liabilities against the corporation than those shown on these statements. Matheney, under the contract, agreed among other things to indemnify and hold the Warwicks harmless for any liabilities not disclosed by the April 30, 1985, financial statement.
At the time the contract was executed, there was a deed of trust held by the First National Bank in Jackson on Matheney's residence to secure the debt owed by Matheney Ford. The contract obligated the Warwicks to make a reasonable effort to get this deed of trust cancelled.
About a week after the contract was signed, Matheney and the Warwicks went to New Orleans and met with Messrs. Bob Jones, Everett Witt and M.J. Thomas, officials of Ford Motor Company, relative to their agreement with a view of obtaining company approval of the Warwicks. Thomas was regional manager of Ford.
Matheney's certified public accountant, Cecil W. Harper, had prepared the tax returns for the business, and who had for all months in 1985 made an extensive review of its financial records. The Warwicks' certified public accountant was Jon Ready. All of Matheney Ford's and all of Harper's work products were made available for inspection by the Warwicks and Ready. Ready did go to the business and examine the financial records but never contacted Harper. The Warwicks were at the business on a daily basis.
Some time in June, 1985, the Warwicks learned that Ford Motor Credit had previously suspended its floor planning of Matheney Ford's new cars.
On July 17, 1985, the Warwicks executed and delivered the following letter to Matheney:
HAND-DELIVERY
Mr. Cecil B. Matheney
Matheney Ford, Inc.
Raymond, Mississippi
Matheney Ford, Inc.
Raymond, Mississippi
Gentlemen:
It has come to our attention that material breaches have occurred in the Agreement For Issuance And Purchase Of Corporate Shares entered into on June 4, 1985 by and among James E. Warwick and Barbara Rhea Warwick, Matheney Ford, Inc. and Cecil B. Matheney, and that significant events have transpired since the date of execution which materially and adversely affect Matheney Ford Inc.'s business and prospects for business. Therefore, it is with regret that we must advise you that we hereby exercise our right to terminate the aforementioned agreement. As you are aware, we have diligently and tirelessly attempted to carry out and conclude this transaction; however, no reasonable prospect for completing our agreement now exist[s].
You have advised us that you have received serious offers of purchase from third parties and we sincerely hope that this will enable you to work the matter out to your satisfaction.
With kindest regards, we are
 Sincerely yours,
 s/ James E. Warwick
 s/ Barbara Rhea Warwick
When they delivered this letter to Matheney, the Warwicks also told him that another reason they were terminating the contract was because Ford Motor Company was dragging its feet in approving them as investors.
Matheney endeavored to get the Warwicks to change their minds. Further negotiations were had, but no agreement was reached.
At some date after the termination of the contract, Matheney sold the dealership back to Cooper, who executed a promissory note therefor for $50,000. Cooper only paid $15,000 on this note, however, before he took bankruptcy.
*335 The Warwicks, still interested in securing a Ford dealership, were successful in purchasing a Ford dealership in Hazlehurst, which they operated for a while under the business name of Continental Ford. They did not keep this dealership, however.
On October 27, 1986, Matheney and Matheney Ford filed a complaint against the Warwicks in the circuit court of the First Judicial District of Hinds County seeking actual and punitive damages for breach of contract.
As their first affirmative defense, the Warwicks alleged that Ford and Ford Motor Credit "wholly failed and refused to grant approval as required as a condition to Defendants' obligations under the Agreement. Therefore, Defendants' obligations thereunder ceased and became null and void." The Warwicks also filed a counterclaim against Matheney for misrepresentations and breach of warranty.
On November 17, 1987, the parties entered an agreed order of dismissal without prejudice as to Matheney Ford, Inc.
About a week before trial, the Warwicks learned that the financial losses to Matheney Ford were greater than shown on the December 31, 1984, statement, and claimed these at trial as an additional reason to terminate the contract. Specifically, Matheney Ford's 1984 income tax returns revealed that the dealership's actual loss for 1984 was $102,001.00 instead of $54,678.00, as indicated on the financial statement. Also, accounts payable on the financial statement were understated by $72,982.00. The net worth of the dealership was overstated on the financial statement by $105,220.00 and negative retained earnings were understated by $71,384.00. Harper explained that the April 30, 1985, financial statement, which was attached to the contract, set out the true financial condition of the dealership since his accounting firm made the proper adjustments to the figures in the December 31, 1984, financial statements while preparing the tax return and the April 30, 1985, financial statement.
Trial of this cause began November 4, 1988.
Harper was the only person who testified on the damages suffered by Matheney as a result of the termination of the contract.[1] He testified that at the time of the contract Matheney Ford had no net worth. Had the Warwicks invested, Harper said the business would have been worth $200,000 and Matheney's corporate shares in such event would have been worth $102,000, or 51% of the business. He therefore was of the opinion Matheney had incurred a loss of $102,000 by virtue of the contract's termination.
The jury returned a verdict in favor of Matheney for $92,000. The verdict was arrived at by first deducting $15,000 which Matheney received from Cooper, from the $102,000 Harper testified was Matheney's loss. To that amount $5,000 was added which represented the amount Matheney had to spend in attorney's fees in getting his residence released from the First National Bank's deed of trust.
The Warwicks have appealed.
Other facts, as necessary for our decision, will be set forth in the opinion.

LAW
Unquestionably, on June 4, 1985, the Warwicks and Matheney and Matheney Ford entered into a carefully drafted and binding contract prepared by the Warwicks' attorney. Just as clearly, unless or until Ford Motor Company and Ford Motor Credit approved this contract and the transaction between the parties, the Warwicks had no further obligation, but upon this approval they were irrevocably obligated to invest $200,000 in Matheney Ford, Inc., by the purchase of 3,843 corporate shares.
The contract is silent as to the time within which Ford Motor Company and Ford Motor Credit were to give approval of the contract, and the law therefore presumes that such approval had to be given in a "reasonable time" considering the condition and circumstances of the parties and Ford *336 Motor Company and Ford Motor Credit. A.M.R. Enterprises, Inc. v. United Postal Sav. Ass'n, 567 F.2d 1277, 1281 (5th Cir.1978); Restatement (Second) of Contracts, § 204; Corbin, Contracts, § 553 (1960); 17 Am.Jur.2d, Contracts, § 330; 17A C.J.S. Contracts, § 590(a), at 1182.
On July 17, 1985, the Warwicks terminated the contract. The Warwicks thereby became liable for any damages caused Matheney Ford and Matheney because of this cancellation, unless they had a legal right to do so. Was this termination a breach of contract, or had the contract already been breached?
The Warwicks offered two reasons for writing the termination letter of July 17:
1. Ford Motor Company and Ford Motor Credit had unreasonably delayed approving the contract;
2. Matheney had made material misrepresentations or concealment of Matheney Ford's financial condition.
In determining whether the Warwicks were liable for any sum, therefore, the only facts to be decided were whether Ford Motor Company and Ford Motor Credit had unreasonably delayed approval, or whether Matheney had made material misrepresentations. If both were answered no, then the Warwicks were liable for whatever loss their breach caused.
On the issue of damages, Matheney Ford had been dismissed as a party, leaving only Matheney individually.
There was no obligation of the Warwicks to purchase Matheney's remaining shares. Therefore, the only basis for damage to Matheney was the diminution, if any, in the fair market value of his stock when the Warwicks cancelled compared to what it would have been had the $200,000 been invested. Mid-Continent Telephone Corp. v. Home Telephone Corp., 319 F. Supp. 1176, 1198-99 (N.D.Miss. 1970).
Had there been an unreasonable delay? Had Matheney made material misrepresentations justifying the Warwicks' cancellation? And, if both these questions were answered no, how much less was Matheney's stock worth than it would have been if the $200,000 had been invested in Matheney Ford?
These were all the questions which needed to be answered by the court and jury.

I. BURDEN OF PROOF
In any suit for a breach of contract, the plaintiff has the burden of proving by a preponderance of the evidence:
1. the existence of a valid and binding contract; and
2. that the defendant has broken, or breached it; and
3. that he has been thereby damaged monetarily.
17A C.J.S. Contracts, § 590(d), at 1148; Crawford v. Ellzey, 57 So.2d 502 (Miss. 1952); G. Salvaggio & Co., Inc. v. Delta Heights, Inc., 277 So.2d 754 (La. App. 1973); Beefy Trail, Inc. v. Beefy King Int'l, Inc., 267 So.2d 853 (Fla.App. 1972); Brown v. Five Points Parking Center, 121 Ga. App. 819, 175 S.E.2d 901 (Ga. App. 1970); Western Tank & Steel Corp. v. Gandy, 385 S.W.2d 406 (Tex.Civ.App. 1964); Wyatt v. O'Neal, 236 Ark. 798, 370 S.W.2d 129 (1963).
In this case Matheney clearly established the existence of a valid contract; there is no dispute as to this. Moreover, in the absence of some provision in the contract authorizing termination or cancellation, every contract is presumed irrevocable. 17A C.J.S. Contracts, § 397; Sports Center, Inc. v. Riddell, Inc., 673 F.2d 786 (5th Cir.1982); United Roasters, Inc. v. Colgate-Palmolive, Inc., 649 F.2d 985 (4th Cir.1981); Earth Products Co. v. Oklahoma City, 441 P.2d 399 (Okla. 1968). Just as clearly established in this case was that the Warwicks by their letter of July 17, 1985, terminated this contract. The parties make no contention that there was any provision in the contract authorizing the Warwicks to cancel it. This letter, therefore, clearly broke the contract. By competent evidence Matheney proved a valid contract and a breach by the Warwicks, and thereby established legal liability.
To escape any liability, it was incumbent upon the Warwicks to affirmatively prove a legal reason or justification for this letter. *337 17A C.J.S. Contracts, § 589, at 1141-42; Carlson Equipment Co. v. Int'l Harvester Co., 710 F.2d 481 (8th Cir.1983); Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957 (5th Cir.1976); Rich v. McMullan, 506 S.W.2d 745 (Tex.Civ.App. 1974).
They offered two reasons:
1. unreasonable delay in approval by Ford Motor Company and Ford Motor Credit, and
2. material misrepresentations by Matheney.
In this case it is particularly appropriate to require the Warwicks to establish affirmatively that these corporations unreasonably delayed approval for the following reasons:
1. The Warwicks' own attorney drafted the contract, and yet it is conspicuously silent as to any time within which these corporations have to approve the contract. Williams. v. Life Ins. Co. of Georgia, 367 So.2d 922, 925 (Miss. 1979); Clark v. Carter, 351 So.2d 1333, 1336 (Miss. 1977).
2. Matheney had no control over when or whether these corporations would approve the contract.
3. Although they were in daily contact, the Warwicks gave neither Matheney nor Ford or Ford Motor Company any advance notice whatever that unless the contract was approved in a certain number of days, they would cancel the contract. The first time Matheney knew of any such intention to terminate was the bombshell letter. A contract which sets no time for performance may not be terminated without reasonable notice. Wright v. Stevens, 445 So.2d 791, 794 (Miss. 1984); Mid-Continent Tel. Corp. v. Home Tel. Corp., supra, 319 F. Supp. at 1196; Schneider v. Rola Const. Co., 183 N.Y.S.2d 955, 16 Misc.2d 556 (1959); 17A C.J.S. Contracts, § 421(1), at 520.
By equally well-settled principles of law, the burden was upon the Warwicks to establish their affirmative defense that Matheney had made material misrepresentations of fact justifying them to terminate the contract. Hertz Commercial Leasing v. Morrison, 567 So.2d 832, 834 (Miss. 1990); McDaniel v. Ritter, 556 So.2d 303, 314 (Miss. 1989); Smith v. Sanders, 485 So.2d 1051, 1053 (Miss. 1986); Hinton v. McKee, 329 So.2d 519, 520 (Miss. 1976).
An issue that was not in this case was whether Ford or Ford Motor Credit would have refused to approve, or that they would not have approved the contract, because the Warwicks terminated the contract before these corporations had made a firm decision.[2] By terminating the contract, the Warwicks foreclosed any such eventuality, leaving solely the question whether there had been an unreasonable delay in approval.
There was no issue before the jury as to whether Ford and Ford Motor Credit either did or would have approved the contract, because the Warwicks, by their letter of July 17, 1985, foreclosed any such eventuality. Any act of Ford or Ford Motor Credit after July 17 either approving or disapproving the contract would have been futile because there was no contract between the parties after July 17. The Warwicks had terminated it. Where a contract is performable on the occurrence of a future event, there is an implied agreement that neither party will place any obstacle in the way of the happening of such event, and where a party is himself the cause of the failure he cannot rely on such condition to defeat his liability. Gridiron Steel C. v. Jones & Laughlin Steel Corp., 361 F.2d 791 (6th Cir.1966); Casale v. Carrigan and Boland, Inc., 288 So.2d 299 (Fla.App. 1974); Katz v. Judice, 252 So.2d 532 (La. App. 1971); Hillis v. Blanchard, 433 S.W.2d 276 (Mo. 1968); 17A C.J.S. Contracts, § 468, at 645. A repudiation or other total breach relieves performance of conditions precedent. *338 Jinright v. Russell, 123 Ga. App. 706, 182 S.E.2d 328 (1971); Restatement (Second) Contracts, § 255; Corbin, Contracts, § 977 (1951); Farnsworth, Contracts, § 8.6 (1982).
While under the terms of the contract, the Warwicks were not obligated to take a single step forward until Ford and Ford Motor Credit approved the contract, this did not give them the right to take a step backward out of the contract, either.
Under these principles we turn to the assignments of error raised in this appeal.

I. REFUSAL OF INSTRUCTIONS
The Warwicks complain of the court's refusal to grant instructions D-2 and D-3(a).
INSTRUCTION D-2
Under the terms of the "Agreement for Issuance and Purchase of Corporate Shares" between Matheney and the Warwicks, the purchase of stock by the Warwicks from Matheney Ford, Inc., was contingent upon approval by Ford Motor Company and Ford Motor Credit Company. The contract provided that in the event Ford Motor Company failed or refused to approve the Warwicks as investors in Matheney Ford, Inc., then all obligations of the Warwicks would cease.
Matheney has the burden of proving by a preponderance of the evidence that either
(i) Ford Motor Company approved the transaction;
or
(ii) Ford failed or refused to approve the transaction solely because of something the Warwicks did or failed to do.
If Matheney fails to prove to you by a preponderance of the evidence that Ford Motor Company approved the transaction between the Warwicks and Matheney or that Ford Motor Company's failure or refusal to approve was solely because of something the Warwicks did or failed to do, then this Court instructs you that the Warwicks' obligation under the contract ceased and your verdict be for the Warwicks.
INSTRUCTION D-3(a)
Neither Ford Motor Company nor Ford Motor Credit Company ever approved the transaction between the Warwicks, Matheney and Matheney Ford, Inc. Therefore, Matheney has the burden of proving to you by a preponderance of the evidence that the Warwicks were the sole and only cause of Ford Motor Company's failure to approve the transaction.
If Matheney fails to meet this burden of proof, you should return a verdict for the Warwicks.
As to these instructions, the circuit judge correctly reasoned:
My problem is, gentlemen, that I think no contract can be drafted to cover every possible contingency or problem that can arise. So the Court has to apply the rule of reasonableness in interpreting contracts. I'm satisfied that the approval by Ford Motor Company is a requisite of the contract. The problem that I have is that there's nothing in there that sets out how long this process is allowed to continue until the Warwicks were entitled to assume they were not approved or the Plaintiff Matheney was entitled to assume that they are approved. Of course, I understand that you have to get something from Ford in writing saying they were approved. But my point is, there's nothing in the instructions that tells the jury what would be a reasonable time for this contract to be enforceable against the Warwicks, at what point in time could the Warwicks say, "Well, we've waited long enough and there's been no approval, and so therefore, we consider the contract not enforceable."
... [t]he question is, did the Warwicks allow sufficient time for Ford to complete this process of approval? If they did, and then they rescinded the contract, they were within their rights. If they should decide that they didn't, then the jury may decide that they were not.
The circuit judge nevertheless gave a modified version of D-3:

*339 If you believe from a preponderance of the evidence that neither Ford Motor Company nor Ford Motor Credit Company ever approved the transaction between the Warwicks, Matheney, and Matheney Ford, Inc. and Ford had a reasonable time to do so, then, Matheney has the burden of proving to you by a preponderance of the evidence that the Warwicks were the sole and only cause of Ford Motor Company's failure to approve the transaction. (Emphasis added to show modification)
If Matheney fails to meet this burden of proof, you should return a verdict for the Warwicks.
For the reasons above set forth, instructions D-2 and D-3(a) were properly refused because they did not address issues to be decided by the jury, and contained incorrect statements of law. Indeed, the modified instruction granted the Warwicks gave them more than they were entitled to. The sole issue was whether there was an unreasonable delay, and the burden was upon the Warwicks to prove that the period from June 4 until July 17, 1985, was an unreasonable delay in approval by Ford and Ford Motor Credit justifying their termination.

II. CONFLICTING INSTRUCTIONS
In their answer the Warwicks set out as their first affirmative defense that Ford and Ford Motor Credit "wholly failed and refused to grant approval as a condition to the Defendants' obligations under the Agreement."
Matheney was granted an instruction that, because the Warwicks affirmatively pleaded that Ford had refused to approve, they had the burden to prove it. This was a correct statement of the law.
The Warwicks were also granted Instruction D-11:
INSTRUCTION D-11
Under the terms of the "Agreement for Issuance and Purchase of Corporate Shares" between Matheney and the Warwicks, the purchase of stock by the Warwicks from Matheney Ford, Inc., was contingent upon approval by Ford Motor Company and Ford Motor Credit Company. The contract provided that in the event Ford Motor Company failed or refused to approve the Warwicks as investors in Matheney Ford, Inc., then all obligations of the Warwicks would cease.
If you believe from a preponderance of the evidence that Ford Motor Company and Ford Motor Credit Company had a reasonable time to approve or disapprove the transaction, but failed to do so, then Matheney has the burden of proving to you that the Warwicks were the sole and only cause of Ford's failure to approve the sale. If Matheney fails to meet this burden of proof, you should return a verdict for the Warwicks.
The Warwicks complain that the instructions were in conflict because under D-11 the burden is placed upon Matheney to prove by a preponderance of the evidence that Ford and Ford Motor Credit had a reasonable time but failed to do so.
The first paragraph of this instruction is a correct statement of the law. The second paragraph, for the reasons above noted, is flawed because it places upon Matheney the duty of proving the Warwicks were the sole and only cause of Ford and Ford Motor Credit refusing to approve.
The conflict between these instructions, if any, was caused by Instruction D-11, which was offered by the Warwicks. A party cannot complain of conflicting instructions when the conflict is caused by an instruction given at his request. Sheffield v. Journal Publishing Co., 211 Miss. 294, 300, 51 So.2d 479, 481 (1951); Clisby v. Mobile & O.R. Co., 78 Miss. 937, 949, 29 So. 913, 916 (1901). Therefore, this assignment is without merit.

III. ABSTRACT INSTRUCTIONS
The Warwicks complain that the following instructions were abstract and should not have been given:
INSTRUCTION P-4
The defendants claim an affirmative defense which is explained in later instructions. *340 The burden of establishing this affirmative defense by a preponderance of the evidence rests upon the defendants.
INSTRUCTION P-16
The court instructs the jury that a breach of contract occurs when a party fails to perform a duty imposed upon him or her by the terms and conditions of the contract of which he or she is a party.
INSTRUCTION P-21
Parties to a contract each have rights which must be determined by the terms of the contract itself, and if the terms are not contrary to law or public policy, the terms of the contract must be enforced as written.
There were other instructions given which specifically informed the jury on the issues before it, and there was no error in granting these instructions. Payne v. Rain Forest Nurseries, Inc., 540 So.2d 35, 40 (Miss. 1989); Detroit Marine Engineering v. McRee, 510 So.2d 462 (Miss. 1987); Woolfolk v. Tucker, 485 So.2d 1039, 1043 (Miss. 1986); Spears v. Protective Life Ins. Co., 260 So.2d 448, 449 (Miss. 1972.)

IV. INSTRUCTIONS ON DAMAGES
The Warwicks complain (Assignment VI in Appellant's Brief) of Instruction P-33:
INSTRUCTION P-33
Should your verdict be for the Plaintiff, you must consider the following factors in determining the amount of damages to be awarded as may be shown by a preponderance of the evidence:
1. The value of Cecil Matheney's stock on July 17, 1985 had the Defendants purchased stock in Matheney Ford, Inc. pursuant to the contract on June 4, 1985.
2. Actual damages suffered by Cecil B. Matheney.
This instruction is incomplete, because it should have informed the jury in what manner it was to arrive at the damages. This missing ingredient, however, is fully satisfied by Instruction D-7 granted the Warwicks:
INSTRUCTION D-7
Before Matheney is entitled to recover any damages against the Warwicks, he must prove to you by a preponderance of the evidence that the Warwicks breached their contract with him. If Matheney proves by a preponderance of the evidence that the Warwicks breached the contract with him, Matheney's damages, if any, shall be determined as follows:
1. The difference, if any, between the Fair Market Value of Matheney's stock in Matheney Ford, Inc., if the transaction with the Warwicks had been consummated and the Fair Market Value of such stock after the Warwicks terminated the contract.
2. From this sum, if any, you should deduct all benefits and sums received or recovered by Matheney when he sold his stock to George Cooper.
Fair Market Value is the price the stock would bring if offered for sale in the open market by an owner, who desires to sell it, but was under no necessity or compulsion to do so, and when purchased by a buyer who desired to buy it, but was under no necessity or compulsion to do so, each having knowledge of the material facts concerning such common stock.

V. INSTRUCTION ON CONSTRUCTION OF CONTRACT
Finally, the Warwicks complain of Instruction P-26:
INSTRUCTION P-26
The Court instructs you that to the extent that the "Agreement For Issuance and Purchase of Corporate Shares" entered into by and between the Plaintiff and Defendants is susceptible to two constructions, the agreement is to be construed most strongly or strictly against *341 the party who drafted the contract; the Defendants.
While this instruction is a correct statement of the law, Kight v. Sheppard Bldg. Supply Co., 537 So.2d 1355, 1358 (Miss. 1989); Mississippi State Highway Comm'n v. Dixie Contractors, Inc., 375 So.2d 1202 (Miss. 1979), it should not have been given because ordinarily the construction to be given words in a contract is first a matter for determination by the court. Palmer v. Fuqua, 641 F.2d 1146 (5th Cir.1981); Nat Harrison Assoc., Inc. v. Gulf States Utilities Co., 491 F.2d 578 (5th Cir.1974); Union Planters Corp. v. Harwell, 578 S.W.2d 87 (Tenn. App. 1978); Louisiana-Pacific Corp. v. Cain, 519 S.W.2d 528 (Tex.Civ.App. 1974); 17A C.J.S. Contracts, § 616. Also, the instruction is abstract.
In view of the multitude of instructions which were given, however, we see no reversible error in the granting of this instruction.

VI. FURTHER NEGOTIATIONS
Following the July 17, 1985, letter, Matheney tried to induce the Warwicks to go ahead with their investment, but without success. The circuit court allowed evidence that the parties had further negotiations, but refused to admit into evidence written documents and proposals, none of which was ever executed. It is well settled that negotiations in attempts to settle a dispute or controversy are inadmissible as evidence. State Highway Comm'n v. Warren, 530 So.2d 704, 708 (Miss. 1988); Mississippi State Highway Comm'n v. Robertson, 350 So.2d 1348, 1350 (Miss. 1977); Barber v. Great Southern Dev. Co., 249 Miss. 662, 669, 163 So.2d 735, 737 (1964); 31A C.J.S. Evidence, § 285 at 731-32.

VII. WEIGHT OF THE EVIDENCE
There is no merit to the Warwicks' argument that there was not a jury issue on liability.
The only evidence offered on the issue of damages was the testimony of Harper, the certified public accountant, in which he gave an opinion that Matheney had sustained a loss of $102,000. There was no objection to this testimony, and the Warwicks offered no evidence on damages. Defense counsel thoroughly cross-examined Harper on his assessment of damages, however. The jury returned a verdict for $92,000 in favor of Matheney.
This Court is not impressed on the proof of damages, but we have held that "if there is any reasonable evidence upon which the jury's verdict could have been based, it should be upheld." Roberts v. Interstate Life & Accident Ins. Co., 232 Miss. 134, 137, 98 So.2d 632, 634 (1957); that unless the verdict of the jury "is manifestly wrong or that it is against all reasonable probability," it should stand. Long v. Woollard, 249 Miss. 722, 742, 163 So.2d 698, 706-707 (1964).
Finally, in Employers Mutual Casualty Co. v. Ainsworth, 249 Miss. 808, 823, 164 So.2d 412, 418-19 (1964), this Court held:
In Williams Yellow Pine Co. v. Henley, 155 Miss., 893, 125 So. 552, the Court reviewed the fundamental principles which govern in determining whether a verdict of a jury should be set aside and in doing so made it clear that a verdict will be side aside on the grounds that it is not supported by reasonably believable proof or is against the overwhelming weight of the evidence, only when it so appears "in such a convincing way as to be fairly inescapable upon the record as presented... ."
164 So.2d at 418.
Harper's testimony being the only evidence offered to the jury on damages, we find no reversible error in the verdict. Cain v. Mid-South Pump Co., 458 So.2d 1048, 1050 (Miss. 1984); Caskey v. Treadwell, 299 So.2d 691, 693 (Miss. 1974); Koehring Co. v. Hyde Constr. Co., 254 Miss. 214, 251, 178 So.2d 838, 853 (1965); Hawkins Hardware Co. v. Crews, 176 Miss. 434, 441, 169 So. 767, 769 (1936).

VIII. CROSS-APPEAL
After the jury verdict of $92,000, Matheney filed a post-trial motion to amend the final judgment to include prejudgment interest *342 at the legal rate from and after the date the breach of contract occurred.
Mississippi recognizes judicial authority to award prejudgment interest to a prevailing party in a breach of contract suit. City of Mound Bayou v. Roy Collins Construction Co., 499 So.2d 1354, 1361 (Miss. 1986); Stockett v. Exxon Corp., 312 So.2d 709, 712 (Miss. 1975). An award of prejudgment interest rests in the discretion of the awarding judge. Aetna Casualty & Surety Co. v. Doleac Elec. Co., 471 So.2d 325, 331 (Miss. 1985). Under Mississippi law, prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith. Id. No award of prejudgment interest may rationally be made where the principal amount has not been fixed prior to judgment. Stanton & Assoc., Inc. v. Bryant Const. Co., 464 So.2d 499, 504 (Miss. 1985).
In this case, Matheney's damages were not liquidated. There were several contested issues regarding the measure of damages, including the value of the stock at the time of the breach. The only amount that was ever certain was the price the Warwicks agreed to pay for the stock. But this does not mean that Matheney's damages were definite. Matheney's complaint asked for $1,000,000 in damages and reasonable minds could have differed as to the amount Matheney was entitled to as a result of the Warwicks' breach. The trial judge did not abuse his discretion in refusing to award prejudgment interest.
AFFIRMED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL.
ROY NOBLE LEE, C.J., and SULLIVAN, PITTMAN and BANKS, JJ., concur.
McRAE, J., concurs in part and dissents in part with separate written opinion joined by DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ.
McRAE, Justice, concurring in part, dissenting in part:
While I concur with the majority's affirmation of the judgment against the Warwicks for breach of contract, I disagree with the refusal to grant prejudgment interest to Matheney as raised in his cross-appeal. For more than three years before a judgment was entered in his favor, Matheney was denied the opportunity to obtain any return on the infusion of capital bargained for in the contract breached by the Warwicks. Equity demands not just recovery of the $92,000.00 jury award, but also compensation for the loss of opportunity to invest those funds between the time the contract was breached and the date of the judgment.
The majority rejected Matheney's cross-appeal on the grounds that the damages were not liquidated. Yet, there is uncontroverted evidence that Matheney suffered a loss of some $102,000.00. We have broadly construed the notion of liquidated or ascertainable damages, holding, for example, that the amount of coverage specified on an insurance policy amounted to a liquidated claim for purposes of prejudgment interest when both parties agreed that the insured premises were a total loss. Simpson v. State Farm Fire and Casualty Co., 564 So.2d 1374, 1381 (Miss. 1990). Even when the dollar value of a loss is in dispute, we have gone so far as to suggest that:
[W]e can envision cases, where, in the discretion of the trial court interest should be allowed although the amount of the loss is in dispute and for this reason we do not foreclose the allowance of interest in every case where the claim is unliquidated.
Commercial Union Insurance Co. v. Byrne, 248 So.2d 777, 783 (Miss. 1971).
Moreover, while we have largely limited the award of prejudgment interest to liquidated claims, we also have recognized the propriety of allowing interest on unliquidated claims, based on those damages established upon a breach of contract. State Highway Commission v. Wunderlich, 194 Miss. 119, 11 So.2d 437, 438 (1943). When *343 damages are not liquidated, "[s]uch allowances are not of interest eo nomine but as added compensation." Id.
The distinction between liquidated and unliquidated damages in allowing the payment of interest on a claim appears to be based on practical rather than theoretical grounds. Williston on Contracts, vol. III, § 1413. In Miller v. Robertson, 266 U.S. 243, 258, 45 S.Ct. 73, 78, 69 L.Ed. 265 (1924), the Supreme Court criticized the practice, stating that although prejudgment interest generally is not allowed on unliquidated claims, "when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as a measure of damages."
We are reminded that prejudgment interest "is not imposed as a penalty for wrong doing; it is allowed as compensation for the detention of money overdue." Rubel v. Rubel, 221 Miss. 848, 75 So.2d 59, 69 (1954). Absent an award of prejudgment interest, there exists a great disparity between the recovery of a party who receives a judgment immediately following his injury and that of a party who must wait several years before receiving his judgment. Carlton v. H.C. Price Co., 640 F.2d 573 (5th Cir.1981). Thus, equity and the desire to fully compensate injured parties has led to the erosion of the delineation of liquidated and unliquidated damages in the determination of prejudgment interest. See, Cavnar v. Quality Control Parking, Inc. 696 S.W.2d 549, 554 (Tex. 1985) (expansion of prejudgment interest to unliquidated damages in personal injury and wrongful death cases).
In expanding the availability of prejudgment interest to unliquidated contract and torts claims, courts have recognized that the potential of such an award serves to encourage settlement and to discourage dilatory trial tactics by the defense. Perry Roofing Company v. Olcott, 744 S.W.2d 929, 930 (Tex. 1988); Cavnar, 696 S.W.2d at 554; Domangue v. Eastern Airlines, Inc., 722 F.2d 256, 264 (5th Cir.1984); Busik v. Levine, 63 N.J. 351, 307 A.2d 571, app. dism'd, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). Further, it has been noted that prejudgment interest serves to prevent the defendant from profiting unjustly by any delays.
[T]he right to interest is a marketplace concept and... the use of the money is a mercantile privilege which should not go uncompensated... . [The defendant] cannot be heard to say that it is fair and equitable that it should enjoy such a financial advantage for so long, and pay not a cent for it.
Phillips Petroleum Co. v. Adams, 513 F.2d 355, 370 (5th Cir.), cert. denied, 423 U.S. 930, 96, S.Ct. 281, 46 L.Ed.2d 259 (1975).
Accordingly, I believe that, as a matter of equity, Matheney is entitled to receive prejudgment interest on the jury award of $92,000.00, accruing from the July 17, 1985 breach by the Warwicks until the time of the November 10, 1988 judgment.
DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ., join this opinion.
NOTES
[1] Matheney testified as additional damages that he had to sue the bank and Cooper to get his residence released from the deed of trust and paid $5,000 in attorney's fees.
[2] The record indicates, however, that these corporations would probably have eventually approved the contract and the Warwicks' investment. One of Ford's branch managers, Gene Trahan, wrote a letter to Ford Motor Company which stated: "I discussed this proposal with Bob Jones, manager of the New Orleans district office, who feels that we both have little choice but to recommend that we both approve the new partner and the $200,000 of fresh capital."