**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 97-CA-01042-SCT**

*GEORGE GARNER*

*v.*

*LANA HICKMAN AND RUSSELL HICKMAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/06/97 |
| TRIAL JUDGE: | HON. JERRY OWEN TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM CARL MILLER |
| ATTORNEY FOR APPELLEES: | WYNN E. CLARK |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 1/14/99 |
| MOTION FOR REHEARING FILED: | 1/28/99 |
| MANDATE ISSUED: | 4/8/99 |

**BEFORE PRATHER, C.J., McRAE AND WALLER, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This case arises from an August 6, 1997 order of the Harrison County Circuit Court granting the Hickman's motion for a directed verdict against George Garner and awarding them attorney fees while also granting Garner's motion for a directed verdict against Russell and Lana Hickman on their counter-claim against him. Finding that the issues raised on appeal and cross-appeal should have been resolved by a jury, we reverse and remand for proceedings consistent with this opinion. We further reverse and render the award of attorney fees to the Hickmans.

I.

¶2. On November 17, 1995, George Garner entered into a written agreement with Russell and Lana Hickman to complete their 3,100 square foot house in Harrison County, Mississippi within ninety days for a total of $82,400. The bid price included redoing much of the work already done on the house by the Hickmans' previous contractor whom they had terminated after the structure was framed because they didn't like his work.[1] The contract contained no provisions for a payment schedule.

¶3. During the course of construction, Garner went to the Hickmans' attorney's office on five separate

occasions and signed five separate forms entitled Contractor's and Owner's Waiver and Disbursement Agreement. Even Russell Hickman acknowledged that he signed the various papers without reading them because they were necessary to get his bank loan. Each was accompanied by an Affidavit and Agreement for the First American Title Insurance Company, with regard to the issuance of a policy of title insurance on the property or an endorsement thereto, which included a paragraph providing that:

> The contractor has been paid in full for work and services performed and materials furnished on the above project to date and does hereby waive, release and surrender any and all lien or claim or right of lien, including amounts earned but retained under contract with owner, to the date for which payment is made, for labor, services and/or materials furnished by the undersigned upon the premises described above, except: (If none, state "None").

Garner signed the first agreement on November 17, 1995, and received a $12,000 draw check. He signed a second such agreement on December 27, 1995, but no check was issued to him at that time. Garner testified that the Hickmans told him this document was necessary for him to receive the next draw. It turned out, however, that the funds drawn by Hickman were used to pay the Goldin Industries claim. On January 8, 1996, he signed a third agreement and received a check for $30,000 with the notation, "Hickman Const. Loan (4th Draw) Payment to Contractor." Garner signed another such agreement on March 1, 1996, which, he recalled, was for Hickman to pay for the carpet ordered for the house. On March 28, 1996, Garner signed a fifth copy of the agreement and a check was issued to one of his workmen, Wally Lott, for $665. On each of the agreements in question, the word "NONE" was typed in the agreement after the "release" paragraph.

¶4. Garner began work on the Hickman's house in late October, 1995, without any upfront money. While he stated that the contractor generally receives draws when the foundation is poured, when the building is ready for sheetrock and upon completion, he had nothing in writing from the Hickmans as to when he would receive payments on the contract. He received two draws totaling $42,000 out of the $82,400 contract price (less $7,100 allowances for carpeting and well drilling).

¶5. Construction proceeded slowly. The contract called for redoing the roof trusses installed by the original contractor; Hickman tore them out himself after Garner began work on them, allegedly scattering trusses and newly cut lumber everywhere. Garner and Lott both estimated that Hickman's antics set the project back by about three weeks. Hickman also ran boards up under the cedar siding to show where nails were missing instead of simply tagging them with tape. Lana Hickman regularly changed her mind about details like cabinets and moldings after they were installed. In addition to delays caused by the owners, the weather was cold and rainy and Garner had trouble finding a brick mason because the inclement weather had put them all behind schedule.

¶6. In late March, 1996, Garner was locked out of the job. Hickman told Wally Lott that he was shutting the project down and was going to finish the job himself. At Garner's request, Lott went to the site and packed up the tractor, the trailer and all of the tools on March 29,1996, the day after Garner signed the papers to obtain a $665 check for Lott's labor.

¶7. The Hickman's expert witness, Steve Foster, a general contractor from Gulfport, estimated that it would cost about $20,143 to complete the house to the Hickman's satisfaction. Although Garner testified that he had replaced two to three hundred studs, Foster noted that some of the walls in the house still were not straight, requiring the replacement of some of the studs. He further stated that the painting wasn't done

properly; there were pits and scratches because the sheetrock wasn't dusted and the paint had been applied too thin.

¶8. Foster further testified that the kitchen cabinets were only a utility room grade and not kitchen quality. He noted also that the window sills and closet shelves were made from a rough grade of lumber, rather than a finish grade and that the interior trim was not fir, as specified in the contract. Garner had testified that he used MDF (medium density fiber board) for the trim because it would look better painted after Lana Hickman decided that she wanted painted woodwork instead of natural wood with a clear finish.

¶9. Looking at the structure and exterior features of the house, holes for soffit vents had been cut all around the house, but the actual vents had not yet been installed. As on the inside, Foster believed that the exterior paints and sealants were not properly applied. The windows, in Foster's opinion, were not properly framed and foam board could be seen between the sheets of cedar siding. He further noted that the "roof cricket" was not installed properly, which could result in water being diverted to the wrong places, there was no moisture barrier in the roof insulation, various electrical wires were pulled a little tight and the bathroom vans vented into the attic insulation. Foster also noted some problems with the installation of the air conditioning system; that, however, was something Hickman had decided he was going to do himself.

## II.

¶10. Garner filed a complaint against the Hickmans in the Circuit Court of Harrison County, First Judicial District on June 10, 1996. He alleged that he was owed the balance due on his contract with them to finish their house and that the Hickmans had refused to allow him to complete the work remaining. He averred that he would file a lis pendens or construction lien against the property in light of the Hickmans' intentional breach of contract. In their answer to the complaint, the Hickmans both raised as a defense and counter-claimed that Garner breached the contract by "a. failing to timely and adequately perform the contract in a workmanlike manner; b. breached an implied duty of good faith and fair dealing; c. negligently attempting to perform the contract; and d. abandoning the contract." They further alleged in their counterclaim that Garner slandered the title to the property by filing an improper lis pendens or construction lien, withdrawing that claim at trial. In their amended answer, defenses and counterclaim, the Hickmans added an eleventh defense, asserting that Garner's claim was barred by accord and satisfaction, release and by the doctrines of waiver and estoppel.

¶11. At the close of Garner's case-in-chief, the circuit court granted the Hickmans' motion for a directed verdict. Then, at the close of the Hickmans' case-in-chief on their counterclaim for breach of contract and negligence, the circuit court granted Garner's motion for a directed verdict. Despite this ruling, the judge stated, "[t]he Court is satisfied that the plaintiff contractor breached the contract." In his final judgment, the circuit judge, who had reserved the issue of attorney fees and other equitable relief arising from the liens against the Hickmans' property, dismissed the claim and counterclaim with prejudice, finding that neither party should take anything by his complaint. He ordered the liens against the Hickmans' property canceled and held for naught. The Hickmans were awarded $3000 in attorney fees.

## III.

¶12. When reviewing a trial court's decision to grant or deny a motion for directed verdict, this Court must do so with great care. *Benjamin v. Hooper Elec. Supply Co*., 568 So. 2d 1182, 1187 (Miss.1990). Just as the trial court is required to do, this Court must consider the motion in the light most favorable to the

party opposing the motion. *Id.* (*citing **Guerdon Indus., Inc. v. Gentry***, 531 So. 2d 1202, 1205 (Miss.1988)). As reiterated in ***Benjamin***, not only has this Court emphasized the jury's role in a trial, but also the United States Supreme Court has noted:

> Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Id.* at 1187 (*quoting **Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 255, (1986)). Thus, a motion for a directed verdict should be granted only where the facts and inferences so considered point so overwhelmingly in favor of the moving party that reasonable men and women could not have arrived at a verdict for the non-movant. *Id.* (*citing **Smith v. Wendy's of the South Inc.***, 503 So. 2d 843, 844 (Ala.1987)(if, by any possible interpretation, the evidence can support a conclusion in favor of the non-moving party, reversal is required)).

¶13. The circuit court granted the Hickmans' motion for a directed verdict, expressly finding that Garner had failed to make a prima facie case on his breach of contract claim. Accepting the Hickmans' arguments, the circuit court found that there was no provision in the contract for progress payments to be made, and that the waiver and disbursement agreements Garner signed served to preclude him from recovering since each of the five affidavits stated that there were no outstanding liens or monies due or payable to the contractor.

¶14. As Garner acknowledges, in any suit for breach of contract, the plaintiff has the burden of proving by a preponderance of the evidence the existence of a valid and binding contract, that the defendant has broken or breached it, and that the plaintiff has suffered monetary damages as a result. ***Warwick v. Matheney,*** 603 So. 2d 330, 336 (Miss. 1992)(citing 17A C.J.S. *Contracts*, § 590(d) at 1148). Both Garner and the Hickmans admit the existence of a binding contract. Garner contends that the Hickmans breached the contract by locking him off the site and not allowing him to finish the job. He further states that he suffered damages in that he only received $42,665 of the $82,400 contract price even though work on the house was substantially complete. He suggests that the circuit court might have premised its ruling on the erroneous assumption that he intentionally waived any claim for monies due by signing the March 28, 1996 release and thus there were no damages which could be proven. Finally, as an alternate theory of recovery, Garner asserts that the jury should have been allowed to consider whether he substantially performed his contract with the Hickmans.

¶15. Looking at the evidence in a light most favorable to Garner, it cannot be said that the evidence, as well as all inferences that may be drawn therefrom, so favors the moving party, the Hickmans, that a reasonable and fair-minded jury could not have found in favor of Garner, the non-moving party. There exists a jury question of whether the Hickmans made it impossible for Garner to perform the contract. "Where a contract is performable on the occurrence of a future event, there is an implied agreement that neither party will place any obstacle in the way of the happening of such event, and where a party is himself the cause of the failure he cannot rely on such condition to defeat his liability." ***Warwick***, 603 So. 2d at 337. Given that there was no provision in the contract for a payment schedule, final payment could be construed as being predicated upon a future event, the timely completion of the house. There is evidence that the Hickmans locked him off the site before the house was completed. Throughout the construction project, there is

evidence that the Hickmans, themselves, contributed to delays in the project making it impossible for Garner to complete the project within ninety days, regardless of adverse weather conditions. Moreover, there was no provision made in the contract for any penalty should the house not be completed in accordance with the time frame specified in the contract nor was there any provision for termination of the contract upon certain specified (or unspecified) conditions. *See Warwick*, 603 So. 2d at 336 (absent some provision in a contract for its termination or cancellation, it is presumed irrevocable).

¶16. The so-called "releases" signed by Garner are problematic, but should not as a matter of law, warrant the grant of a motion for directed verdict against him. The Hickmans correctly assert that release of claims provisions have been construed as reaching all claims a contractor has against the client at the time each release was signed. *Galin Corp. v. MCI Tel. Corp.*, 12 F.3d 465, 469 (5th Cir. 1994)(applying New York law). However, as distinguished from the case *sub judice,* the releases in *Galin* were made expressly in consideration for payment of monies owed. The releases therein provided in relevant part:

> In consideration of payments made heretofore, or to be made based upon this invoice for labor, material, equipment, subcontract work, and any and all costs incurred for the performance of the contract work invoiced thus far, the Contractor hereby unconditionally and without reservation releases and indemnifies MCI and their officers, agents, employees, assignees and heirs from any and all liens, claims, demands, penalties, losses, costs, damages and liability in any matter whatsoever.

*Galin,* 12 F.3d at 468. These releases were part and parcel of invoices for specific labor performed and materials provided, as distinguished from the case *sub judice,* where the agreements Garner signed made no reference to any contract work performed and were, in fact, part of documents required by the title insurance company or the bank which had provided Hickman's loan. Further, it does not appear that Garner signed them in consideration for payments made to him for work done since he received only two drafts and the three remaining times he signed the documents, funds were paid to Hickman, or in the case of the March 28, 1996, a payment was made directly to Wally Lott for labor performed. The circumstances are such a jury should also have been allowed to consider whether the so-called release was void because of an absence of good faith and a full understanding of legal rights, misrepresentation of the nature and effect of the document or lack of adequate consideration. *Willis v. Marlar*, 458 So. 2d 722, 724 (Miss. 1984). Looking at the evidence in light most favorable to Garner, it does not point so overwhelmingly in favor of the Hickmans that a reasonable jury could not have found in favor of Garner.

¶17. Garner also asserts that the issue of substantial performance should have been put before a jury. In *Bevis Construction Co. v. Kittrell,* 243 Miss. 549, 139 So. 2d 375 (1962), this Court stated:

> substantial performance is not literal, full or exact performance in every slight or unimportant detail, but performance of all important particulars; and that substantial performance exists where the building or structure as a whole is not impaired, where it can be used for its intended purpose after erection, where the defects can be remedied without any great expenditure and without material damage to other parts of the structure and may without injustice be compensated for by deductions from the contract price.'

*Id.* at 558-59, 139 So. 2d at 379 (*quoting Jackson v. Caffey*, 223 Miss. 368, 78 So. 2d 361 (1955)). *See also Standard Mill Work & Supply Co. v. Mississippi Steel & Iron Co.*, 205 Miss. 96, 110, 38 So. 2d 448 (1949)(*overruled on other grounds by IP Timberlands Operating Co. v. Denmiss Corp.*, No. 96-CA-00140-SCT (Miss. April 2, 1998))(substantial performance of construction contracts

generally will support a recovery either on the contract or on a quantum meruit basis because "materials and labor upon a building are such that even if rejected by the owner of the land he receives benefit thereof;" it is therefore equitable to require him to pay for what he gets; "it is next to impossible for a builder to comply literally with all the minute specifications in a building contract;" and "the parties are presumed to have impliedly agreed to do what is reasonable under all the circumstances with reference to the subject of performance.") Looking at the evidence in a light most favorable to Garner, there is evidence that he did, indeed, substantially comply with the terms of the contract and the issue should be put to a jury.

¶18. The evidence is such that a reasonable and fair-minded jury could have found in favor of Garner, the non-moving party. Further, there are a variety of issues which could - and should - have been left to the jury to resolve. The circuit court, therefore erred in taking the case away from the jury and granting a directed verdict in favor of the Hickmans.

## IV.

¶19. The Hickmans counterclaimed that Garner breached his contract with them, asserting that he failed to timely and adequately perform the contract in a workmanlike manner and that he breached an implied duty of good faith and fair dealing, negligently attempted to perform the contract and abandoned the contract. Although the circuit judge stated when granting the Hickmans' motion for a directed verdict on Garner's claim that "[t]he Court is satisfied that the plaintiff contractor breached the contract," he granted Garner's motion for a directed verdict on the Hickman's counterclaim. On cross-appeal, they now assert that the circuit court erred in granting Garner's motion.

¶20. The Comment to M.R.C.P. 50, which provides for motions for a directed verdict and for judgment notwithstanding the verdict, states that "Rule 50 is a device for the court to enforce the rules of law by taking away from the jury cases in which the facts are sufficiently clear that the law requires a particular result." Without citing any authority, the Hickmans' argument focuses solely on summarizing the testimony of their expert witness, contractor Steve Foster, who inspected the house three times. Foster pointed out a variety of alleged deficiencies and/or deviations from the contract specifications, itemizing particular problems with the quality of the workmanship or the materials used. He found that it would cost some $20,143.00 to rectify the problems he found. Even looking at the evidence presented in a light most favorable to the Hickmans, however, we cannot say that the facts, and the inferences that can be drawn therefrom, are sufficiently clear that the law might dictate a particular result or that the evidence so plainly favors Garner, the movant, that reasonable jurors could not have found in favor of the non-movants, the Hickmans. Indeed, even the circuit court's ruling is less than clear in that it granted Garner's motion for a directed verdict despite finding that he had breached the contract. Further, looking at the record, including the trial transcript, Garner's itemized bid for the project and the photographs of the house, there exists a jury question as to whether the evidence shows that Garner's workmanship was negligent or substandard, that the house lacked finishing details because Garner was not given an opportunity to complete the project or because he abandoned it, or that the Hickmans simply got what they paid for: a 3,1000 square foot house for well under $100,000. Moreover, there exists a jury question as to what, if any, damages the Hickmans suffered. Thus, the circuit court further erred in taking the issues raised by the Hickman's counterclaim away from the jury.

## V.

¶21. Although the circuit court entered a directed verdict in favor of Garner on the Hickmans' cross-claim,

he awarded the Hickmans $3000 in attorney fees. It appears from the record that the award and the grant of the directed verdict were based on the circuit court's finding that although Garner breached his contract with the Hickmans, the Hickmans suffered no monetary damages and because the Hickmans' attorney asserted that they were entitled to an award of attorney fees pursuant to Miss. Code Ann. § 85-7-151.

¶22. In breach of contract cases, attorney fees generally are not awarded absent provision for such in the contract or a finding of conduct so outrageous as to support an award of punitive damages. *Greenlee v. Mitchell,* 607 So. 2d 97, 108 (Miss. 1992); *Central Bank of Mississippi v. Butler*, 517 So. 2d 507, 512 (Miss. 1987). In cases involving insurance contracts, we have found that extra-contractual damages such as attorney fees may be warranted even where the facts are not such to support a punitive damages claim. *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992). Thus, pursuant to the Litigation Accountability Act of 1988, Miss. Code Ann. § 11-55-5 (Supp. 1998), an award of attorney fees would be appropriate as extra-contractual damages where a claim or defense was raised for purposes of harassment or delay or a party acted to unreasonably protract the proceedings.

¶23. There was no contractual provision in the case *sub judice* for attorney fees in the event of litigation. Even had we found that the circuit court properly granted the directed verdicts, both in favor of the Hickmans on Garner's claim and in favor of Garner on the Hickmans' cross-claim, there is nothing on the record to suggest that Garner's initial claim was brought solely for the purpose of harassment or delay or that his actions were such that extra-contractual damages were warranted pursuant to *Veasley* or §11-55-5. The record clearly indicates that the Hickmans contributed significantly to their own problems. Thus, while *Veasley* damages would be appropriate in many construction contract cases where neither the contract nor any statutory authority provide for attorney fees, they are not warranted under the facts of the case *sub judice*.

¶24. The Hickmans' contention that attorney fees were warranted pursuant to Miss. Code Ann. § 85-7-151 (1991) further is unfounded. Section 85-7-151 specifically addresses costs and attorney fees on judgments in suits on builder's and contractor's liens, providing:

> In case judgment be given for the plaintiff against the builder, it shall, in case he was actually served with process, be entered against him generally, with costs, as in other cases, and with attorney's fees as provided below, and with a special order for the sale of the property upon which the lien exists for the payment thereof, and for an execution, as in other cases, for the residue of what may remain unpaid, after the sale of the property; and if the defendant be brought in by publication only, and have not appeared, the judgment shall be entered specially for the debt and costs, to be made of the property in the petition described; and in case a general judgment be not given against the builder, such proceedings or recovery shall not be a bar to any suit for the debt, except for the part thereof actually made under such recovery. When judgment is rendered in favor of the plaintiff against the builder, the builder shall be liable for reasonable attorney's fees to be set by the judge for the prosecution and collection of such claim.

Miss. Code Ann. §§ 85-7-141 through 85-7-157 provide for suits to enforce a mechanic's, materialman's or contractor's lien. Garner did not bring suit against the Hickmans to enforce the construction lien he had filed against their property; rather, he brought only a breach of contract action. The issue of the lien was addressed first in the Hickmans' counterclaim, where they asserted that Garner had slandered their title by filing the lien; that claim, however, was withdrawn by the Hickmans at trial. This is not the sort of action for

which § 85-7-151 is intended to provide attorney fees.

## VI.

¶25. Garner's claim and the Hickmans' counterclaim both raise issues of fact which should have been allowed to go to a jury for resolution. In neither instance does the evidence so overwhelmingly favor the moving party that a fair-minded jury could not have found in favor of the non-moving party. The point is well-illustrated by the circuit court's conflicting findings that Garner breached the contract and yet was entitled to a directed verdict on the Hickman's counterclaim against him for breach of contract. While it appears that the circuit court, upon hearing evidence and finding that the cost of finishing the house to the Hickmans' satisfaction was less than what was owed Garner under the terms of the contract, took the case from the jury in an attempt to fashion a settlement between the parties, we find that he erred in granting directed verdicts on both the Garner's claim and the Hickman's counterclaim as well as in awarding attorney fees to the Hickmans. We therefore reverse and remand for proceedings consistent with this opinion.

¶26. **REVERSED AND REMANDED ON DIRECT APPEAL AND CROSS APPEAL; REVERSED AND RENDERED AS TO AWARD OF ATTORNEY FEES.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR.**

1. As of November 17, 1995, Sellers had a claim against the Hickmans for $8,156.31 for unpaid labor and services as well as an additional $225 for materials. There further was a claim for materials by Goldin Industries, Inc. in the amount of $4,163.76.