# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00596-SCT

*H.A.S. ELECTRICAL CONTRACTORS, INC.*

*v.*

*HEMPHILL CONSTRUCTION COMPANY, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/24/2015 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JIM L. DAVIS, III |
| ATTORNEYS FOR APPELLEE: | DAVID BONDS ELLIS |
| | DANNY ALTON DRAKE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/12/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### EN BANC.

### RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:

¶1.     This case returns after remand to the trial court, which was instructed to complete a

***Batson***[1] analysis.[2][3] The trial court has provided a certified result of that proceeding. The trial

---

[1] ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2]

   On remand, the trial court should conduct the third step of ***Batson*** analysis for Juror 7. HAS should be allowed the opportunity to prove purposeful discrimination – i.e., Hemphill's race-neutral reason for striking Taylor was pretextual. And Hemphill should be permitted to defend its stated reason for striking Taylor – age. But Hemphill is restricted from giving any new, race-neutral reason to justify the strike. Further, to support their arguments, both parties are limited to using the record as it existed at the time of the original ***Batson*** hearing.

court ruled that H.A.S. Electrical Contractors, Inc. (HAS) failed to meet its burden of proving purposeful discrimination.

¶2.     We have reviewed the entire record of all proceedings and affirm the trial court judgment. HAS failed to prove (1) purposeful discrimination in the jury selection process, or (2) that the trial court's ruling was clearly erroneous, or (3) that the trial court's ruling was against the overwhelming weight of the evidence. *See* ***Booker v. State***, 5 So. 3d 356, 357-58 (Miss. 2008). Accordingly, we affirm the jury's verdict, the trial court's denial of HAS's motion for new trial, and the trial court's post-judgment award of attorney's fees to Hemphill.[4]

## BACKGROUND FACTS AND PROCEDURAL HISTORY

¶3.     Hemphill was the general contractor on a project in Waveland, Mississippi, to rebuild a state park after Hurricane Katrina.  Hemphill entered a subcontract with H.A.S. Electrical Contractors, Inc. (HAS) – one of many entered into between these companies, both before and after the event complained of – to perform the electrical work. According to HAS,

---

***H.A.S. Elec. Contractors, Inc. v. Hemphill Constr. Co.***, No. 2015-CA-00596-SCT, 2016 WL 3091754, at *5 (Miss. June 2, 2016) (***H.A.S. I***). In ***H.A.S. I***, this Court specifically held that HAS wholly failed to meet its burden in proving Hemphill's race-neutral reason for striking  Juror 13 – his employment – was pretextual. ***Id.*** Any argument raising the issue of Juror 13 is barred by *res judicata* and needs no further discussion.

[3] I agree with my fellow justice that peremptory strikes should be viewed as a whole. Dis. Op. at ¶ 50. Contrary to the dissent's assertions, the trial court was not limited or restricted in performing its ***Batson*** analysis on Juror 7. However, Hemphill was restricted from providing any new, race-neutral reason to justify its strike, and any other reason aside from age will not be considered.

[4] We expressly reserved the attorney's-fees issue for post-remand.

2

Hemphill did not pay HAS all it was owed under the subcontract. HAS sued Hemphill for breach of contract, *quantum meruit*, and conversion. After Hemphill had paid HAS $2,498,000, HAS claimed an additional $570,678.71[5] was due, plus attorney's fees, costs, and punitive damages. Hemphill countersued for breach of contract, seeking $23,677.04 in damages.

¶4.    After a three-day trial, the jury found in favor of Hemphill on both HAS's claims and Hemphill's counterclaim. However, the jury declined to award Hemphill monetary damages. The subcontract entitled the "prevailing party" to reasonable attorney's fees and expenses. Hemphill filed a post-trial motion for attorney's fees. Hemphill sought $105,506.72 – $101,787.71 of which was expended to defend against HAS's claims. Hemphill attached detailed spreadsheets listing the time its attorneys spent on the case and their hourly rates. The trial court entered judgment for $90,000 in attorney's fees, an amount the trial court believed was spent in defense of HAS's claim.

¶5.    HAS filed a motion for new trial or, in the alternative, a motion for judgment notwithstanding the verdict (JNOV). HAS argued that the trial court erred (1) in allowing Hemphill to use two of its peremptory strikes to exclude two African Americans from the jury, arguing neither pretext nor purposeful discrimination,[6] and (2) in not finding the unilateral attorney's-fees provision of the contract to be unconscionable. The trial court

[5] In its opening statement, HAS reduced its compensatory claim to approximately $270,000.

[6] The first time pretext and purposeful discrimination were mentioned in the trial-court proceedings was by the trial court on remand, quoting this Court's order in *H.A.S. I.*

3

denied HAS's motion for new trial and alternative motion for JNOV.

¶6.     In its briefs, HAS complains of the attorney's-fees award and argues that the trial court mishandled the *Batson* hearing when HAS challenged Hemphill's use of peremptory strikes on Juror 7 and Juror 13,[7] both African-American males.

## STANDARD OF REVIEW

¶7.     Dual standards of review apply in today's case. In reviewing a claim for a *Batson* violation, we follow the standard set by the United States Supreme Court, which states that "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207, 170 L. Ed. 2d 175 (2008) (citations omitted). We will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence. *Booker*, 5 So. 3d at 357-58. We "afford [] great deference to the trial court's finding of whether a peremptory challange was race neutral . . . because finding that a striking party engaged in discrimination is largely a factual finding." *H.A.S. I*, 2016 WL 3091754, at *3. A trial court's decision to award attorney's fees is subject to the abuse-of-discretion standard of review. *See Wyssbrod v. Wittjen*, 798 So. 2d 352, 357 (Miss. 2001); *Terex Corp. v. Ingalls Shipbuilding, Inc.*, 671 So. 2d 1316, 1324 (Miss. 1996).

## ANALYSIS

**I.      *Batson***

_____

[7] In our prior opinion, we found no *Batson* violation as to Juror 13.

4

¶8.    ***Batson*** requires a three-step analysis. *See* ***H.A.S. I***, 2016 WL 3091754, at \*3. This three-step process is to prevent peremptory strikes from being used in a racially discriminatory manner. ***Pitchford v. State***, 45 So. 3d 216, 224 (Miss. 2010) (citing ***Batson***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69).

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

***Pitchford***, 45 So. 3d at 224. This Court consistently has held that:

> [t]he ***Batson*** doctrine is not concerned with racial, gender, or ethnic balance on petit juries, and it does not hold that a party is entitled to a jury composed of or including members of [a] cognizable group. Rather, it is concerned exclusively with *discriminatory intent* on the part of the lawyer against whose use of his peremptory strikes the objection is interposed.

***Strickland v. State***, 980 So. 2d 908, 915 (Miss. 2008) (quoting ***Ryals v. State***, 794 So. 2d 161, 164 (Miss. 2001)) (emphasis added).

¶9.    "Unless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race neutral." ***Randall v. State***, 716 So. 2d 584, 588 (Miss. 1998). This process does not demand an explanation that is persuasive, or even plausible – "any reason which is not facially violative of equal protection will suffice." ***Id.*** "[R]ace neutral explanations must be viewed in the light most favorable to the trial court's findings." ***Walker v. State***, 815 So. 2d 1209, 1215 (Miss. 2002). It is well-established for ***Batson*** determinations that:

[a] reversal will only occur if the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence." *Tanner [v. State]*, 764 So. 2d 385, 393 (Miss. 2000). . . . "On appellate review, the trial court's determinations under *Batson* . . . are accorded great deference because they are based, in a large part, on credibility." *Coleman v. State*, 697 So. 2d 777, 785 (Miss. 1997). . . . The term "great deference" has been defined in the *Batson* context as meaning an insulation from appellate reversal any trial findings which are not clearly erroneous. *Lockett v. State*, 517 So. 2d [1346,] 1349 (Miss. 1987).

*Booker v. State*, 5 So. 3d 356, 357-58 (Miss. 2008) (quoting *Smith v. State*, 835 So. 2d 927, 940 (Miss. 2002)). This standard conforms to the United States Supreme Court's ruling in *Snyder*, 552 U.S. at 477, which held that "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *See also Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)) ("[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"). In *Hernandez*, the United States Supreme Court added that "in the absence of exceptional circumstances, we would defer to [the trial court]." *Hernandez*, 500 U.S. at 366, 111 S. Ct. 1859.

¶10.    At the beginning of voir dire, the trial court introduced HAS's client, Harry Schepens, to the venire. Well before the *Batson* issue arose, Hemphill's attorney asked the venire:

> Mr. Schepens (HAS's founder and star-witness) has had some medical issues. I don't know if they're going to impact this trial, but I am concerned about sympathy. . . . I want to know that you can just listen to the testimony and not let any medical issues cloud your judgment. I want to know that you can be fair and impartial and listen just to that testimony.

One sixty-seven-year-old prospective juror (Juror No. 28) conceded that Schepens's condition[8] would cause her not to be fair and impartial. Additionally, the panel was informed that this was a construction case involving "a subcontractor-contractor dispute."

¶11. A review of the first hearing transcript revealed to Judge Emfinger that he "got . . . off kilter" by Davis's (HAS's attorney's) asking for an immediate race-neutral reason, contrary to the trial court's customary practice. In the remand analysis, the trial court clarified his own words. The trial court recognized that, not only had it failed to follow its normal, procedural analysis of *Batson* pursuant to Rule 4.05 of the Uniform Rules of Circuit and Chancery Court Practice, but it had mistakenly said a "pattern" had not been proven, rather than stating HAS had failed to show a prima facie case of purposeful discrimination. Although, a pattern is not an essential element to establish a prima facie showing of purposeful discrimination, it is an element which can be used.

¶12. Upon receipt of the remand order, Judge Emfinger reviewed the transcript of the first hearing and, without objection, attached a copy of the jury list with his notes and jury information cards as exhibits to this record.[9] [10]

¶13. On remand, Judge Emfinger readily recognized his mistake, recounting his reaction

---

[8] The record reflects that Mr. Schepens was two months post-stroke and seventy-nine years old.

[9] This exhibit reveals that no other juror over the age of fifty-five was selected by Hemphill, after striking Taylor, before Juror No. 15, a sixty-seven-year-old, was tendered. That white juror was HAS's third preemptory strike, all three of whom were white. Nor was this Court aware that Juror 28 was a sixty-seven-year-old white female.

[10] HAS's Motion for a New Trial provided only the gender and racial make-up of the first two panels of the venire. However, HAS did not include the age of the panel members.

to HAS's attorney's statement:

> . . . Mr. Davis responded, "Judge, we'll just point out that that's the first black we've reached on the panel.
>
> Now, at that point in time none of these attorneys in this case, I've never been in a jury trial with any of these attorneys, I did not know -- so they didn't know what process the court may use in considering *Batson* challenges and what process may be in place to designate who's white, who's black, who's male, who's female. So when Mr. Davis said that, I assumed that he was making a record that this was a black juror that had been stricken.
>
> . . .
>
> But that's why when he made that statement, "Judge, we'll just point out that that is the first black we've reached on the panel," when I said "anything further," I really didn't expect there to be anything further. That's just what I always say when something comes up.
>
> But, in any event, Mr. Davis at that point said, "Judge, we -- I guess we would go ahead and ask for a race neutral reason because it's the first black we've reached on the panel at this time of the venire."
>
> Now, at that point, I think I made my first mistake. Under the Uniform Rules of Circuit and County Court Practice, Rule 4.05, Jury Selection Process, 4.05(b) says that "constitutional challenges to the use of preemptory challenges shall be made at the time each panel is tendered."
>
> Now I've always done that and that's the way that it's always been done in my presence when I was both a practicing attorney and since I've been on the bench and I don't know why at this point I allowed Mr. Davis to go forward with his *Batson* challenge.
>
> You can look on down to -- on page 53, and lines 19 through 24, when Mr. Davis again wanted to raise a *Batson* challenge. On line 23, I said, "I'm going to let you make that objection at the end," meaning when whole panel had been tendered again.
>
> I consider that when Mr. Davis had tendered 12 people to the defense that that was the proper time for the defense to raise any *Batson* or reverse *Batson* challenges that it might wish to use. After the defense then had gone through all 12 of the panel of the jurors that were tendered to them, then that

would have been the appropriate time for Mr. Davis to have raised any ***Batson*** challenges. However, I allowed him to go forward here so I think that's part of what got us off kilter there was I allowed that challenge to proceed prior to the time it really should have at the conclusion or after the defense had considered all 12 jurors that had been tendered to them.

Now next I say, "Well, I don't see how in the world you can have a pattern after one strike, but I will, as I believe the cases say, I should ask you for a race neutral reason for Number 7, Taylor." Now my thought process is, at that point in time, I was finding that Mr. Davis had not made a prima facie showing of racial discrimination.

I used the word pattern. I used the word pattern because in all the cases I've ever dealt with and I've ever seen, prima facie cases have been based upon there being a pattern in the number of strikes, all the strikes being used against black jurors or a disproportionate number being made against black jurors as opposed to white jurors.

But there was nothing in this case as it existed, nothing during the voir dire or nothing that was said that existed outside of the fact that this was the first black juror that was presented and it was the first black juror that was stricken by the defense as Dl. But while I used the word pattern, I was finding that there was not -- that the defense -- excuse me, that Mr. Davis had not made a prima facie showing of racial discrimination.

Now what happened next was the process that I believe I was required by a prior Mississippi Supreme Court rulings to make. I had always, both as a practicing attorney and since I've been on the bench, the practice has been that even if you found that there was not a race -- a prima facie showing of racial discrimination the court would always go forward and make a record for appellate purposes and require or ask that a race neutral reason be given. That's how we've always done it in this district and how I've always seen it done; so that if I was incorrect in finding that the plaintiff had not made a prima facie showing of racial discrimination, that the record would be complete for the Supreme Court to consider. . . .

¶14. When Davis raised ***Batson*** regarding Juror 7, Judge Emfinger states that he assumed Davis was merely noting for purposes of the record that Juror 7 was an African American. Although Judge Emfinger stated "Anything further?" he did not expect a reply. At that point,

Davis made a premature demand for a race-neutral reason. Judge Emfinger accommodated Davis's request, which HAS claims was error. Judge Emfinger offers that this accommodation was contrary to his practice as an attorney and as a trial judge. Judge Emfinger acknowledged that he failed to follow Rule 4.05 of the Uniform Rules of Circuit and County Court Practice, which reads that "[c]onstitutional challenges to the use of preemptory challenges shall be made at the time each panel is tendered." URCCC 4.05. The proper time to consider *Batson* challenges was after Drake had tendered a panel to Davis.

¶15. Judge Emfinger further informs us that he misspoke when he used the word "pattern."

> Now what I meant by saying that was that there had not been a prima facie showing, that Mr. Davis had not made a prime facie showing of racial discrimination. "That's the first person -- that's the first black that's been presented. I don't believe that there's any possible pattern." So I was just rehashing at that point that I had found that there had not been a prima facie showing of racial discrimination.

Judge Emfinger explained that he made a finding that Davis had not established a prima facie case of purposeful discrimination, an error acknowledged by Judge Emfinger. Even though Judge Emfinger determined no prima facie case had been made, he required Hemphill to state a race-neutral reason. That error is of no event for, once Judge Emfinger asked for a race-neutral reason and Drake provided age, the prima facie showing became moot. *Manning v. State*, 735 So. 2d 323, 339 (Miss. 1999) ("When the prosecution gives race-neutral reasons for its peremptory strikes, the sufficiency of the defendant's prima facie case becomes moot.").

¶16. Judge Emfinger clarified that, at the time he ruled on the strike, he was deciding whether age was a valid race-neutral reason or an impermissible category.

10

Now at that point in time, as I was sitting here, there was several things going through my head: Number one was that when they gave the race neutral reason as age, I was considering whether or not, I knew that race and gender were prohibited or suspect categories under **Batson**, and I was trying to remember whether or not age was a race neutral reason or whether or not age was a suspect category, I know that age is a suspect category in certain other matters and I was trying to determine or thought in my mind as to whether or not I had an age discrimination problem with that being used, I started to respond and I said, "All right. I believe that there's not a pattern."[11]

. . .

Now with my next sentence I'm considering the race neutral reason that I was given by the defense, the older venire, "whether there's one or two or three, I don't believe that's a good reason" and all that time I'm considering whether or not age is a problem or whether or not age is a race neutral reason.

At that point, I decided that, in fact, age was a good race neutral reason and that there was nothing about that that would cause or for me to – nothing about the process there that caused me to believe that the defense was using that strike to discriminate based upon race and I said I'm going to recognize the strike and we went forward.

¶17. Because Judge Emfinger determined that no prima facie case had been made, Hemphill should never have been required to provide a race-neutral reason for the strike. However, once Judge Emfinger required a race-neutral reason be given, he was then required to determine if HAS had proffered sufficient rebuttal that Hemphill was purposefully discriminating against Juror 7 because of his race. Judge Emfinger was required to weigh the

---

[11] Judge Emfinger's comment in the first hearing was as follows:

Well, I believe that there's not a pattern. That's the first person – that's the first black that's been presented. I don't believe that there's any pattern possible. The older venire, whether there's one or two, or three, I don't believe that's a good reason so I'm going to – I'm going to recognize the strike.

This was a source of confusion for the **H.A.S. I** Court.

11

reason given – "Your Honor, we – my reason, race neutral or otherwise, was age. We just thought he was – we would prefer not to have an older jury panel." – against the rebuttal, if any was offered. No rebuttal was forthcoming. HAS stated only that Hemphill "accepted Number 2, who is 68 years old, and Number 5 that was 62 years old, but they were both white." The trial court found Hemphill's age/older-jury-panel reason was race-neutral. We have no factual basis to find otherwise.

¶18.   The record reveals that no other person over the age of fifty-five was selected by Hemphill after Juror 7 was struck. The record reveals Hemphill achieved an age-balanced jury panel: the panel consisted of one juror in her twenties; three jurors in their thirties; three jurors in their forties; three jurors in their fifties; and two jurors in their sixties. The record reveals the very next two jurors selected by Hemphill were younger African Americans.

¶19.   The trial court concluded the remand hearing by making the follow findings:

> When I was considering the ruling then and in considering my ruling now, the issue was whether or not they struck him because of age but they struck him because they would prefer not to have an older jury panel. The fact of the matter is they already had someone 68 on the panel, someone 62, and I believe Mr. Taylor's 63, and that the objection was or the reason was they did not wish to have an older panel. Now that's why I was considering one, two, or three.
>
> But at the end of the day, age being a sufficient race neutral reason, the fact that you've already got two people above the age of 60 on the jury venire, there was nothing about that strike that I believed was purposeful discrimination and I believe that it was not pretextual and I believe that Mr. Taylor was stricken because they did not wish to have so many older persons on the jury that heard this case. The fact that they already had two above 60, I think they struck Mr. Taylor because he was the third person out of the first seven there that was going to be above the age of 60 and they did not want to have an older jury panel  and I believe that is a race neutral reason and I don't find that to be pretextual. Nothing that was said today really changes my mind

12

from what I saw and heard that day and so that will be the Court's ruling.

As I go forward now, you've looked at other things, you know, and, obviously, I've looked at other things. The only other person that was above the age of 60 that was tendered to either side in this case was Juror Number 15 . Juror Number 15, Ms. Houston, she was actually stricken by the plaintiff. So unless I'm missing something, the defense did not have another person that was submitted to them during the course of the proceedings that was above the age of 60.

Again, I'm noting that now. That's not something that I would have considered, because we were only at Juror Number 7, so I wouldn't have considered that then. But I did consider the fact that age was a race neutral reason and that it wasn't the age of a particular juror but, actually, the objection or their race neutral reason was we don't have an older jury panel and to have the third person out of the first six jurors to be above the age of 60, I can see that as being a race neutral reason. So that's going to be my ruling.

The trial court found Hemphill's stated reason during voir dire – "prefer[ring] not to have an older jury panel" – as permissible, credible, and not pretextual.

¶20.     Based on the record before us, there is no evidence of purposeful discrimination of African-American jurors, despite the dissent's protestations otherwise. This case was remanded to the trial court for a *Batson* examination as to Juror 7, offering a full opportunity for HAS to rebut Hemphill's reason. The trial court acknowledged that he acted upon the premature insistence of HAS in requesting an immediate ruling on its *Batson* challenge. Judge Emfinger acknowledged he did not follow his customary practice of conducting a hearing at the time the jury panel had been tendered.

¶21.     We find no error in the trial court's acceptance of Hemphill's race-neutral reason. HAS's rebuttal was lacking and nonconvincing to Judge Emfinger. It is unavailing to this Court as well. Judge Emfinger determined that Hemphill had previously accepted jurors who

13

were sixty-eight years old and sixty-two years old. However, no juror over the age of fifty-five was selected for service after Hemphill's first strike. Only HAS struck a juror over that age, when it struck a sixty-seven-year-old, white female.

¶22. Upon reconsideration, Judge Emfinger found HAS developed no racial animus, no pretext evidence, or purposeful discrimination, and conclusively no **Batson** violation. Contrary to the dissent's assertion otherwise, HAS was given the opportunity when the panel was seated and again when this case was remanded to offer rebuttal to meet its burden of proving purposeful discrimination. It failed to do so before the trial court. The trial court's ruling was neither clearly erroneous nor against the overwhelming weight of the evidence."'[The best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,' making the trial court's firsthand observations of even greater importance." **Synder**, 552 U.S. at 477.

¶23. We reject the dissent's baseless assertion that Hemphill's counsel's reason for striking Juror 7 and Judge Emfinger's and the Majority's findings are absurd. Such a charge fails to account for age being a valid race-neutral reason for striking a venire member. Age is a well-supported, race-neutral reason for a peremptory strike. *See, e.g., * **Stewart v. State**, 662 So. 2d 552, 558 (Miss. 1995) (citing **Harper v. State**, 635 So. 2d 864, 868 (Miss. 1994); **Simon v. State**, 633 So. 2d 407, 411 (Miss. 1993); **Lockett**, 517 So. 2d at 1351)). Thus, we find that Hemphill's reason for striking Juror 7 – not wanting to seat an older jury panel – was not pretext for purposeful discrimination.

¶24. Hemphill, as the striking party, met its burden under step two of **Batson** to

14

demonstrate a race-neutral explanation for the strike. *See Pitchford*, 45 So. 3d 216, 224 (Miss. 2010) (describing three-step process of *Batson*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69). Under step three, the burden shifted back to HAS to prove the stated reason for the strike was merely a pretext for discrimination. *Id.*

¶25.    HAS argues "disparate treatment" – i.e., "the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge." *Lynch*, 877 So. 2d at 1272. Because Hemphill accepted two white female jurors aged sixty-three and sixty-eight, HAS argues the strike of a black male juror in his sixties based on his age is per se pretextual. But this Court has held disparate treatment "is not necessarily dispositive of discriminatory treatment." *Berry*, 802 So. 2d at 1039. Rather, it "is only one factor to be considered by the trial court[.]" *Id.* Moreover, after considering this factor and no other rebuttal, the trial court reached a different conclusion. Instead of proving pretext, the trial court found that two jurors in their sixties already accepted actually led credence to Hemphill's contention that it "would prefer not to have an older jury." In other words, the trial court concluded this factor made Hemphill's race-neutral reason more credible, not less so, a point not addressed by the dissent.

¶26.    The rule of law requires this Court to defer to the credibility finding of the trial court, unless plainly contradicted by the record before us. The record shows Hemphill accepted the very next two jurors, both younger African Americans.[12] And every juror thereafter accepted by Hemphill was younger than Juror 7. The record supports the trial court's findings.

_____

[12] Based on her juror information cards, Juror 8 was twenty-five, and Juror 9 was fifty-five.

¶27. We therefore find no merit in HAS's claim that it is entitled to a new trial "[a]s the record in the case sub judice does not reveal that the peremptory strikes were used in such a way as to violate the **Batson** rule." **Berry**, 802 So. 2d at 1047.

## II. Attorney's Fees

¶28. Following trial, the trial court ordered HAS to pay Hemphill $90,000 in attorney's fees and expenses. For the trial court to award attorney's fees in a breach-of-contract action, the contract must provide for them or there must be a finding of conduct so outrageous as to support an award of punitive damages. **Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.**, 743 So. 2d 954, 971 (Miss. 1999).

¶29. HAS acknowledges the subcontract entitled Hemphill to recover attorney's fees if it prevailed in a dispute with HAS.[13] Still, HAS argues the attorney's-fees provision is unenforceable, as it entitled only Hemphill to recover attorney's fees. But we have upheld one-sided provisions like this one. *E.g.,* **Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n**, 964 So. 2d 1100, 1114 (Miss. 2007). While HAS cites several cases that found either substantive or procedural unconscionability due to a one-sided indemnity or arbitration clause, each of those cases involved a clear contract of adhesion. *See* **Caplin Enters., Inc. v. Arrington**, 145 So. 3d 608, 614 (Miss. 2014) (finding payday-lending agreements containing arbitration clauses were substantively unconscionable contracts of adhesion);

---

[13] Specifically, paragraph 21 of the subcontract provided:

As the prevailing party in any dispute between the parties arising out of or related to this Subcontract or the breach thereof, Contractor shall be entitled to recover its reasonable attorney's fees and expenses incurred in pursuing or defending any claim.

*Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695, 699 (Miss. 2009) (emphasizing "[t]his Court twice before has found the admissions agreement at issue in this case to be a contract of adhesion"); *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So. 2d 1202, 1207 (Miss. 1998) (finding customer-service agreement containing indemnity clause was a contract of adhesion, because Entergy was only energy provider in the area and refused to negotiate agreements with its customers).

¶30. By contrast, the subcontract between HAS and Hemphill was not a contract of adhesion. Instead, it was a contract between two businesses that had worked together multiple times on large-scale construction projects. As we have held, to enforce a contract "without enforcing the clause addressing attorney fees would be contrary to the law." *Theobald v. Nosser*, 752 So. 2d 1036, 1042 (Miss. 1999). Here, the trial court found the subcontract was enforceable. So the attorney's-fees provision also was enforceable.

¶31. Alternatively, HAS argues the attorney's-fee provision does not apply based on the facts. Since the jury awarded Hemphill zero money damages, HAS reasons Hemphill was not "the prevailing party." But the attorney's-fees provision did not condition Hemphill's right to attorney's fees on its recovery of money damages. Hemphill merely had to be "the prevailing party." And in HAS's suit against Hemphill for more than a half-million dollars in damages, Hemphill clearly prevailed. The jury specifically found in favor of Hemphill on all of HAS's claims. Thus, under the plain language of the subcontract, Hemphill was "entitled to recover its reasonable attorney's fees and expenses incurred in . . . *defending* . . . [HAS's] claim." *See also Aspired Custom Homes, LLC v. Melton*, 72 So. 3d 540, 551

17

(Miss. Ct. App. 2011) (enforcing contractual attorney's-fees provision in favor of successful defendants in breach-of-contract action).

¶32.    While a closer question, we find Hemphill also was the "prevailing party" in its counterclaim against HAS – and thus is "entitled to reasonable attorney's fees and expenses incurred in *pursuing . . .* [its] claims." As with HAS's claims, the jury expressly found in favor of Hemphill on Hemphill's counterclaim for breach of contract. While the jury awarded zero damages, as we recently clarified, money damages are not an element of a breach-of-contract claim—rather, they are one type of remedy. ***Bus. Commc'ns, Inc. v. Banks***, 90 So. 3d 1221, 1225 (Miss. 2012), *overruling **Warwick v. Matheney***, 603 So. 2d 330, 336 (Miss. 1992). By expressly finding in favor of Hemphill on its counterclaim for breach of contract, the jury necessarily found Hemphill proved by a preponderance that HAS had breached the contract.

¶33.    With no damages awarded, Hemphill's victory on its counterclaim admittedly is hollow. But we agree with the United States Supreme Court that the degree of a plaintiff's success does not alter a party's *eligibility* to recover attorney's fees—instead, it goes to the reasonableness of the award. ***Farrar v. Hobby***, 506 U.S. 103, 114, 113 S. Ct. 566, 574, 121 L. Ed. 2d 494 (1992) (interpreting "prevailing party" language in a federal civil-rights statute).

¶34.    To support its contention that the $90,000 award was unreasonable, HAS first reiterates the award was unreasonable because Hemphill was awarded no money damages. But this argument ignores the fact Hemphill had to defend itself against HAS's claims that

18

Hemphill owed it more than $570,000 under the contract. So, even had Hemphill not asserted a counterclaim for money damages, Hemphill still would have accrued significant attorney's fees and expenses during the course of the litigation. According to Hemphill, of its $105,506.72 in attorney's fees and expenses, $101,787.71 went toward defending against HAS's claims. Thus, we find it was reasonable for the trial court to award Hemphill almost all of the attorney's fees and expenses requested, even with no money judgment.

¶35. HAS also claims the attorney's-fees award was unreasonable because the $90,000 figure was "plucked out of the air." HAS pulls this phrase from *Young v. Huron Smith Oil Co.*, 564 So. 2d 36, 40 (Miss. 1990), in which this Court found a fee award of $7,500 was an abuse of discretion because the attorney testified he spent only twenty-nine hours on the case and typically charged $100 per hour. In other words, the evidence supported accruing $2,900 in fees—less than half the amount awarded. But in contrast to *Young*, the trial court here actually awarded Hemphill *less* than it requested, not more. In its post-trial motion, Hemphill requested $105,506.72 total or, at a minimum, $101,787.71 in defense-related fees and expenses. And it backed this claim, using the "lodestar" method of calculating fees, multiplying the number of hours its attorneys worked on the case with the attorneys' average hourly rates. *See Mauck v. Columbus Hotel Co.*, 741 So. 2d 259, 271 (Miss. 1999) (explaining the "lodestar" calculation). So, contrary to HAS's assertion, the trial court did not merely pluck a figure from the air. Instead, it reviewed Hemphill's evidence and determined $90,000 was a reasonable amount.

¶36. "It is well settled in this State that what constitutes a reasonable attorney's fee rests

within the sound discretion of the trial court[.]" *Id.* at 269. And here, based on the record, we do not find the $90,000 award to be an abuse of discretion.

## CONCLUSION

¶37. Because HAS is not entitled to a new trial based on Hemphill's use of peremptory strikes, we affirm the judgment in Hemphill's favor on all claims. And because Hemphill was "the prevailing party" entitled to attorney's fees under the subcontract, we also affirm the post-trial order that HAS pay Hemphill $90,000 in attorney's fees and expenses.

¶38. **AFFIRMED.**

**WALLER, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, JUSTICE, DISSENTING:**

¶39. On June 2, 2016, a majority of this Court affirmed the trial court's actions regarding the peremptory challenge to Juror Number 13, and remanded with instructions regarding the peremptory challenge to Juror Number 7. I dissented to that action and wrote:

> The approach taken by the majority and concurring opinion would seem to be designed to limit, rather than fully enforce, the mandate of *Batson*. The majority's holding that, notwithstanding the questionable circumstances surrounding the strikes of both Jurors 7 and 13, that each must be considered in a vacuum and that there was no error with respect to Juror 13, at best defies logic. At worst, it appears to be a self-fulfilling prophecy upon which to justify a finding of no discriminatory action. Accordingly, I dissent from the majority's finding that the trial court did not err in conducting its *Batson* analysis for Juror 13 and would require the trial court to consider Hemphill's use of its peremptory strikes in whole.

*H.A.S. Elec. Contractors, Inc. v. Hemphill Constr. Co., Inc.*, 2015-CA-00596-SCT, 2016 WL 3091754, at *9 (Miss. June 2, 2016).

20

¶40.    The trial court now has returned the case to this Court, and the majority, consistent with its self-fulfilling prophecy, proceeds to fully affirm the actions of the trial court. The manner in which this Court has handled this case is closely related to the pretext seen in the jury-selection process intended to provide justification for inappropriate, or discriminatory actions. Because I believe that 1) the manner in which the majority has handled this matter is closely akin to being pretext; and 2) the majority errs, I again dissent as to the **Batson** issue.[14] I take no issue with the majority's finding on attorney's fees.

¶41.    On remand, pursuant to this Court's directive and limitation, the trial judge conducted a **Batson** hearing solely on Juror 7. Hemphill attempted to explain its reasoning for its use of a peremptory strike against Juror 7, stating:

> [N]ot wanting an older jury venire is not simply a number. The – the jurors, the two older white women, who we did not use strikes on, did not possess the same characteristics that [Juror 7] did, which is being – carrying those characteristics of being aged. In the dictionary it's – the – the definition of age is that – one of the definitions of age is being in an advanced stage of life. . . .

¶42.    Hemphill cited **Williams v. State**, 909 So. 2d 1233 (Miss. Ct. App. 2005), in which the Court of Appeals stated that "we can visualize some instances where age, as a reason for striking a younger venire member, may be pretextual but not so for an older venire member because of the maturity possessed, as well as the infirmities sometimes borne, by older persons." **Id.** at 1237. Hemphill likened its case to the **Williams** case and explained that, because it had a contracts-based case, it:

> needed jurors that could pay attention. We needed jurors that could follow

---

[14] **Batson v. Kentucky**, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

along, that could read the contract. This particular juror was exhibiting these characteristics. He wasn't – he did not seem to follow along. He did not seem to be with – our – our arguments or discussions during voir dire. . . .

¶43.    Having looked with great care at the record now before the Court, I find Hemphill's stated justifications for the strike of Juror 7 difficult to credit.[15] Hemphill struck Juror 7, sixty-three-year-old Don Taylor, an African American, from the jury pool, citing age as its justification.[16] Taylor had retired from the Jackson Regional Office of the United States Department of Veterans Affairs ("the VA"), where he had been employed for thirty-seven years and had been appointed as the Division Chief of Vocational and Rehabilitation  and Employment Services. Taylor also had completed a graduate-school degree. Yet Hemphill now claims that Taylor just did not seem to be able to "follow along" with its arguments or discussions. However, nothing in the record supports Hemphill's contentions regarding Juror 7's inability to "follow along." In fact, the record is suspiciously silent as to how Juror 7 carried his age. Hemphill, both at trial and on remand, failed to describe a single characteristic or mannerism that Juror 7 supposedly portrayed to justify its contention that Juror 7 could not understand a contracts case. If Hemphill had been concerned about Juror 7's ability to follow along, it could have used voir dire in an attempt to determine if its

_____

[15]Likewise, I find the majority's notion that HAS failed to argue both pretext and purposeful discrimination difficult to credit. HAS might not have uttered the magic words, yet clearly from context it argued that Hemphill's use of peremptory strikes was improper. Counsel for HAS accurately argued that two Caucasian jurors had been accepted previously who were similar in age to Juror 7, who was African American.

[16]Juror 7 was sixty-three years old at the time that Hemphill struck him allegedly because of age. Interestingly, at least four members of this Court are older than Juror 7's sixty-three years. Are we to presume the ages of those particular Court members sufficient reason to disqualify them from judicial service?

concerns were well-founded. Hemphill did not voir dire Juror 7. And Hemphill had no qualms about accepting Juror 2, a sixty-eight-year-old Caucasian female whose highest level of education obtained had been a high-school diploma.

¶44. Further making Hemphill's given justifications suspect, at the time Hemphill struck Juror 7 for age, Hemphill had in its possession the Juror Information Forms that each juror had filled out. Those forms detailed Juror 7's advanced education and work history. Additionally, those Juror Information Forms made Hemphill aware that two Caucasian jurors of similar age, but lesser education, were prior to Juror 7. Had Hemphill not wanted an older jury, it was not required to strike specifically Juror 7. Hemphill additionally had been aware that after Juror 7, only one of the following fifteen potential jurors had been over fifty-five years old. Hence, I submit that Hemphill's acceptance of Juror 7 likely would not have turned the jury into "an older jury venire."

¶45. To justify its failure to ask any age-related questions during voir dire, Hemphill stated that it "could observe by looking and observing and did not need to voir dire as to that characteristic." Hemphill then went on to state that Juror 7 "actually carries with him those traits of an older person; not like my boss who's in his . . . upper 60s and who still runs 4 miles a day and works 12 hours everyday." Hemphill had no knowledge and no interest in determining what Juror 7's ability was. Juror 7 may well have run five miles every day, or walked five miles every day. I find it hard to believe that a sixty-three-year-old retired Division Chief of the VA who had obtained a graduate degree could not "follow along" with Hemphill's arguments. Especially in light of the fact that Hemphill had accepted a sixty-

23

eight-year-old, a fifty-three-year-old, and a fifty-one-year-old whose highest levels of education had been high-school diplomas.

¶46. Hemphill attempted to justify its strike of Juror 7 by stating that Juror 7 had carried "those characteristics of being aged." It then stated that Juror 7 did not seem to follow along. Yet Hemphill offered no detail, stated no mannerism, listed no fact to support the assertions that Juror 7 was aged and could not follow along. And while it is true that nonverbal cues are not found in cold records, an attorney must explain his use of a strike by stating those nonverbal cues, not by merely asserting that the cues existed.[17] For example, the Supreme Court in *Hernandez v. New York*, found no *Batson* violation where the prosecutor explained why he was uncertain that two potential jurors would be able to follow along:

> After petitioner raised his *Batson* objection, the prosecutor did not wait for a ruling on whether petitioner had established a prima facie case of racial discrimination. Instead, the prosecutor volunteered his reasons for striking the jurors in question. He explained:
>
> "Your honor, my reason for rejecting the - these two jurors - I'm not certain as to whether they're Hispanics. I didn't notice how many Hispanics had been called to the panel, but my reason for rejecting these two is I feel very uncertain that they would be able to listen and follow the interpreter."
> After an interruption by defense counsel, the prosecutor continued:
>
> "We talked to them for a long time; the Court talked to them, I talked to them. I believe that in their heart they will try to follow it, but I felt there was a great deal of uncertainty as to whether they could accept the interpreter as the final arbiter of what was said by each of the witnesses, especially where there were going to be Spanish-speaking witnesses, and I didn't feel, when I asked them whether or not they could accept the interpreter's translation of it, I didn't feel

---

[17]Great deference is given to the trial judge's findings on whether an attorney credibly relied on demeanor. *Snyder v. Louisiana*, 552 U.S. 472, 480, 128 S. Ct. 1203, 1210, 170 L. Ed. 2d 175 (2008). However, when the trial judge summarily accepts a peremptory strike without making a determination on demeanor, there is no deference to give. *Id.*

that they could. They each looked away from me and said with some hesitancy that they would try, not that they could, but that they would try to follow the interpreter, and I feel that in a case where the interpreter will be for the main witnesses, they would have an undue impact upon the jury."

*Hernandez v. New York*, 500 U.S. 352, 356–57, 111 S. Ct. 1859, 1864–65, 114 L. Ed. 2d 395 (1991) (citation omitted). An attorney does not win his case by stating that he has good reasons. He must explain those reasons with evidentiary support. Here, Hemphill's evidentiary support is lacking.

¶47.    The majority discusses and block-quotes a lengthy portion of the trial court's attempt to explain its mistake in allowing HAS to go forward with its ***Batson*** claim.[18] The majority then correctly comes to the conclusion that, regardless, once the trial court required a race-neutral reason be given, it then was required to weigh that reason for possible pretext. The majority then repeated itself, stating: "The trial court acknowledged that he acted upon the premature insistence of HAS in requesting an immediate ruling on its ***Batson*** challenge. Judge Emfinger acknowledged that he did not follow his customary practice of conducting a hearing at the time the jury panel has been tendered." As previously noted, the trial court's failure to follow the correct procedure is irrelevant and the purpose of such a lengthy discussion can only be to distract from the issue at hand. The issue being, that while Hemphill did give a facially-race neutral reason for the peremptory strike of Juror 7, the trial court rotely accepted that reason and completely failed in its responsibility to ensure that all

---

[18]The majority initially states that HAS's client, Harry Schepens, had been struggling with medical issues and that one juror had stated that his conditions would cause her not to be fair and impartial. I fail to see the correlation between Schepens's medical issues and age, the issue that is before us today.

25

discrimination is eliminated from the jury-selection process. The mere fact that a reason is facially race-neutral does not mean racial discrimination has not been practiced.

¶48.　I submit that the majority makes the same mistake today in its attempt to explain away and mask the issue of discrimination by focusing on the contention that Hemphill never should have been required to explain its reason for striking Juror 7. The record shows that the trial court did ask for a race-neutral reason and that it was required to consider Hemphill's proffered reason no matter its previous mistake. "Discrimination in jury selection . . . causes harms to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. . . ." ***J.E.B. v. Alabama ex rel. T.B.***, 511 U.S. 127, 140, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994)). Such errors cast doubt on the integrity of the judicial process. ***Id.*** We must do all we can to eliminate discriminatory practices from jury selection, for "by enforcing a discriminatory peremptory challenge, the court 'has not only made itself a party to the [biased act], but has elected to place its power, property and prestige behind the [alleged] discrimination.'" ***Edmonson v. Leesville Concrete Co.***, 500 U.S. 614, 624, 111 S. Ct. 2077, 2085, 114 L. Ed. 2d 660 (1991).

¶49.　At this point, I again voice my concerns over the majority's decision to limit the ***Batson*** hearing to Juror 7 and to exclude review of Hemphill's use of a peremptory strike against Juror 13. "[P]eremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." ***Batson v. Kentucky***, 476 U.S. 79, 96, 106 S. Ct. 1712, 1723, 90 L. Ed. 2d 69 (1986). "Exclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed

26

to cure." *Id.* at 1716. The purpose of remanding this case for a *Batson* hearing was to determine whether Hemphill had engaged in the purposeful or deliberate exclusion of a potential jury member on account of race in violation of the Equal Protection Clause.

¶50.    Because review of the use of peremptory strikes is such a fact-intensive inquiry, I believe that consideration of the strikes as a whole is the only way to fully and fairly evaluate whether unlawful discrimination has occurred. The United States Supreme Court has found that in reviewing the use of peremptory strikes, the strikes must be considered as a whole, reiterating in *Snyder* that:

> In *Miller–El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted. 545 U.S. at 239, 125 S. Ct. 2317. Here, as just one example, if there were persisting doubts as to the outcome, a court would be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks. In this case, however, the explanation given for the strike of Mr. Brooks is by itself unconvincing and suffices for the determination that there was *Batson* error.

*Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203, 1208, 170 L. Ed. 2d 175 (2008).

¶51.    The application of the cumulative-error doctrine is not new to this Court either.[19] This

---

[19]Singling out each use of a peremptory strike without consideration of the strikes as a whole results in a specious evaluation of a *Batson* violation.

> The trial court should carefully consider all relevant circumstances, including the strength of the evidence which initially raised the inference and especially the nature of the prosecutor's explanations *viewed in toto. . . .* The more subjective the explanation and the more tenuously related to juror bias or qualification, the more suspect is the prosecutor's *entire scheme of jury selection*. Thus, in making the ultimate determination of whether the defendant has proved racial discrimination, the trial court should consider the *sum quality of all the prosecutor's proffered explanations*.

Court previously has emphasized the importance of reviewing peremptory strikes in toto:

> While each individual strike may have justifiably appeared to the trial court to be sufficiently race neutral, the trial court also has a duty to look at the State's use of peremptory challenges in toto. *See Miller-El*, 125 S. Ct. at 2331 (the ruling in *Batson* "requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."); *Stewart v. State*, 662 So. 2d 552, 559 (Miss.1995) ("the trial court must consider all the relevant circumstances, such as the way prior peremptory strikes have been used and the nature of the questions posed on voir dire."); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003) ("After analyzing each of the prosecutor's proffered reasons, our precedent suggests that the court should the [sic] step back and evaluate all of the reasons together.") (Emphasis added).

*Flowers v. State*, 947 So. 2d 910, 937 (Miss. 2007); *cf. Lomax v. State*, 192 So. 3d 975, 977 (Miss. 2016) ("We find cumulative error occurred at trial that deprived Lomax of the right to a fair trial."). In making the ultimate determination of whether the defendant has proven intentional racial discrimination, the trial court must look at the collective use of peremptory strikes.[20] Segregating each strike for individual consideration, as the majority has done, defies logic and sound reasoning and does little to eliminate unlawful racial discrimination from the jury-selection process. No harm would result from the comprehensive review of peremptory strikes, and I submit that the only benefit bestowed from this Court's decision to limit review

---

Brian J. Serr, *Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of A Delicate Balance*, 79 J. Crim. L. & Criminology 1, 64 (1988) (emphasis added).

[20]*See also Greer v. State*, 310 S.W.3d 11, 19 (Tex. App.-Dallas 2009) ("If the reason given for striking a single minority veniremember is sufficiently unconvincing, the striking of that veniremember suffices to show *Batson* error. *Id.* But the reviewing court may also consider the strikes of more than one juror together if the outcome is otherwise questionable."); *Bedford v. State*, 548 So. 2d 1097, 1098 (Ala. Crim. App. 1989) (citations omitted) ("Any inferences arising from the use of peremptory strikes to remove blacks should be viewed together 'with other relevant circumstances' to determine whether purposeful discrimination has occurred.").

is to those who have a mind to discriminate, and the majority's decision allows and encourages them to continue to do so.

¶52.    In summary, the *Batson* Court stated that, "in view of the heterogeneous population of our Nation, public respect for our . . . justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race." *Batson*, 476 U.S.  at 99. In order to be sure that no citizen was disqualified from jury service based on his race, challenged peremptory strikes must be considered as a whole. As this Court previously has acknowledged, the trial judge conducted an improper initial *Batson* hearing and cut short his analysis due to his erroneous pattern belief. But the majority has deliberately denied the trial court the opportunity during the second hearing to correctly conduct a *Batson* hearing and consider both strikes together.

¶53.    When counsel for H.A.S. stated that he would not accept Hemphill's given reason for striking Juror 13 as race-neutral, the trial court gave H.A.S. no opportunity to explain why. The trial court simply stated, "All right. I do." The trial court made this ruling even though it admittedly had no knowledge of the case and thus, could not have known whether temporary or part-time employment would have created a bias toward Hemphill. The majority now performs the same superficial analysis to conclude that Hemphill's stated reason had not been pretextual. Had the majority allowed the trial court to conduct a full *Batson* hearing, H.A.S. would have had the opportunity to rebut Hemphill's assertion that it had excluded Juror 13 because he had listed his place of employment as Labor Ready and to inquire into why Hemphill had not asked on voir dire whether any of the other potential

29

jurors had been temporarily employed or whether they had worked part-time in order to determine whether others might have had the same potential for bias. Instead, the majority's previous holding prevented any analysis into whether Hemphill's strikes of Juror 13 and Juror 7 together had shown pretext for discrimination.

¶54. While the trial judge again found that Hemphill's use of its peremptory strike against Juror 7 was not pretextual, I disagree in light of Hemphill's attempted justifications at the *Batson* hearing on remand. Furthermore, I believe that the trial court could not have made a fully educated decision on whether Hemphill engaged in purposeful discrimination without review of Hemphill's use of peremptory strikes in toto. How the majority believes that limiting review of peremptory strikes as a whole fulfills its duty to eliminate purposeful discrimination in the jury-selection process defies comprehension.

¶55. In its zeal to justify its self-fulfilling prophecy of nondiscrimination, the majority demonstrates a profound lack of understanding of the consideration of peremptory strikes as a whole as set forth in *Snyder* and in this dissent. That profound lack of understanding is displayed in the majority's footnote 3 and in its paragraph 20. The majority infers that so long as the trial court looked at Juror 7, it considered the strikes as a whole. Even a cursory reading of *Snyder* shows the majority's lack of understanding. *Snyder* clearly requires that each strike be considered with every other strike:

> In *Miller–El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted. 545 U.S. at 239, 125 S. Ct. 2317. Here, as just one example, if there were persisting doubts as to the outcome, a court would be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks.

30

In this case, however, the explanation given for the strike of Mr. Brooks is by itself unconvincing and suffices for the determination that there was ***Batson*** error.

***Snyder v. Louisiana***, 552 U.S. at 478, 128 S. Ct. at 1208. This Court limited the ability of the trial court to consider the strike of Juror 13 for the bearing it might have upon the strike of Juror 7.

¶56. This fact is made abundantly clear in paragraph 26 of this Court's opinion of June 2, 2016, wherein it stated:

> Because the trial court did not err in its ***Batson*** analysis of Juror 13, we do not disturb the trial court's determination that the strike of Juror 13 was nondiscriminatory. We remand the question of striking Juror 7 only.

***H.A.S. Elec. Contractors, Inc. v. Hemphill Const. Co.***, No. 2015-CA-00596-SCT, 2016 WL 3091754, at *5 (Miss. June 2, 2016). This fact also is made abundantly clear by the majority's footnote 2, wherein it states, "Any argument raising the issue of Juror 13 is barred by *res judicata* and needs no further discussion."

¶57. The majority writes that Hemphill achieved an age-balanced jury panel. However, Hemphill did not argue that it struck Juror 7 to achieve an age-balanced jury panel. Hemphill stated its desire to have jurors who could follow along and could read the contract. There is nothing in the record to suggest that Juror 7 was illiterate and could not read the contract. Indeed, just the opposite is true. Nor is there any suggestion by Hemphill of any action or inaction on the part of Juror 7 which would call into question his ability to follow along.

¶58. The stated reason of Hemphill for striking venireman 7 was absurd. The trial court's finding of no pretext and no discrimination was absurd. This Court's affirmance of these

31

absurd actions is equally absurd.

¶59.    Peremptory strikes that run skin-deep cannot be the future of this country, as they have in the past. Therefore, I dissent, not only from the majority's decision to fully affirm the actions of the trial court, but also from its decision to limit review of Hemphill's use of peremptory strikes to Juror 7. I would reverse and remand this case for a new trial.

**KITCHENS, P.J., JOINS THIS OPINION.**